Alassane BA, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CM–1438.

District of Columbia Court of Appeals.

Argued Aug. 28, 2002.
Decided Oct. 31, 2002.

William G. Dansie, Washington, DC, appointed by the court, was on the brief for appellant.

Elizabeth H. Danello, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Assistant United States Attorneys, were on the brief for appellee.

James Klein, Public Defender Service, with whom Edward Shacklee, Tracey Weaver, and Andrea Roth, Public Defender Service, filed an amicus curiae brief on behalf of appellant.

Before REID and GLICKMAN, Associate Judges, and KERN, Senior Judge.

REID, Associate Judge:

Appellant Alassane Ba was convicted of violating a civil protection order ("CPO") under D.C.Code §§ 16–1004, –1005 (2001) at a bench trial.[1] On June 9, 2002, this court issued an opinion affirming Mr. Ba's conviction.[2] *Ba v. United States*, 800 A.2d 692 (D.C.2002). Subsequently, after receiving petitions for rehearing or rehearing en banc, the court vacated its opinion; granted rehearing; requested new briefing directed at the following issue: "Under the circumstances of appellant's case, was consent a defense to the Civil Protection Order"; and scheduled the matter for oral argument.[3] On rehearing, Mr. Ba continues to contend that his reconciliation with

1. D.C.Code § 16–1005 provides, in pertinent part:

    (d) A protection order issued pursuant to this section shall be effective for such period up to one year as the Family Division may specify, but the Family Division may, upon motion of any party to the original proceeding, extend, rescind, or modify the order for good cause shown.

    . . . .

    (f) Violation of any temporary or permanent order issued under this subchapter and failure to appear as provided in subsection (a) shall be punishable as contempt.

    (g) Any person who violates any protection order issued under this subchapter shall be chargeable with a misdemeanor and upon conviction shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 180 days, or both.

2. At that time, the case was on the summary calendar, and neither party requested oral argument.

3. The parties filed cross-petitions for rehearing or rehearing en banc. In addition, Corporation Counsel, D.C. filed an amicus brief in support of appellee's petition for rehearing or rehearing en banc, and attached to the brief numerous official documents which were not contained in the record when the case was considered initially by this court, and which pertained to a related matter prosecuted separately by the Corporation Counsel,

D.C. The George Washington University Law School Domestic Violence Clinics, Catholic University Columbus Community Legal Services Families and the Law Clinic, Women Empowered Against Violence (WEAVE), Partnership for Civil Justice, D.C. Coalition Against Domestic Violence, Bread for the City, and Pace Women's Justice Center also filed a joint amicus brief in support of appellee's petition for rehearing or rehearing en banc. The Public Defender Service filed an amicus brief in support of appellant's petition for rehearing or rehearing en banc.

The District government, supported by the federal government, argued, in part, that the opinion should have incorporated additional facts showing Mr. Ba's violation of the CPO. However, based upon documents attached to the Corporation Counsel's amicus petition for rehearing or rehearing en banc, it is clear that the additional facts relate to the separate matter prosecuted by the Corporation Counsel, D.C. which is not before us, although an appeal of that matter was noticed in the trial court. The notice of appeal was not forwarded to this court, and neither party called the matter to the court's attention prior to our now vacated decision. That matter concerned an amended verified intrafamily offense motion to adjudicate Mr. Ba in criminal contempt for violation of the December 29, 1999, CPO on eight occasions from March 23, 2000 to May 12, 2000. Trial on these charges was held on August 10, 2000, and Mr. Ba was

the complainant after the issuance of the CPO effectively vacated that order and provided him with a valid defense, or at least precluded a finding that he wilfully violated the CPO. Invoking the equitable doctrine of "unclean hands" and the concept of consent, the Public Defender Service, as amicus, argues that: "This [c]ourt should recognize consent as a defense given the [complainant's] conduct in this particular case, preclude enforcement of the CPO against Mr. Ba as a matter of equity, and reverse Mr. Ba's conviction." We affirm appellant's conviction, holding that on the facts of this case, the government proved beyond a reasonable doubt that Mr. Ba willfully violated the CPO.

## FACTUAL SUMMARY

The record before us reveals that in December 1999, Ms. Lashance Howard filed a petition and affidavit for a CPO against her ex-boyfriend of four years, Mr. Ba. On December 29, 1999, Mr. Ba signed a Consent CPO Without Admissions, which was effective for a twelve-month period. The CPO ordered Mr. Ba not to "assault, threaten, harass, or physically abuse [Ms. Howard] in any manner," to "stay at least 100 feet away from [Ms. Howard], [her] home [and her] workplace[,]" and prohibited him from contacting her "in any manner." The CPO further explicitly warned that: "Any and every failure to comply with this order is punishable as criminal contempt and/or as a criminal misdemeanor and may result in imprisonment for up to six months, a fine of up to $1,000, or both."

Subsequently, Mr. Ba was charged with one count of violation of a CPO, which allegedly occurred on May 13, 2000. A hearing on this charge took place on July 14, 2000. At the July 14 hearing, the

government (represented by an Assistant United States Attorney) presented the testimony of Ms. Howard, and Officer Wayne David of the Metropolitan Police Department. Mr. Ba testified for the defense.

Ms. Howard's direct, cross and redirect examination revealed that sometime after December 29, 1999, she and Mr. Ba lived together while the CPO still was in effect, and when they were attempting to work out problems in their relationship. During this period, Ms. Howard and Mr. Ba sometimes stayed at his place of residence and sometimes at Ms. Howard's home. The two continued to reside together until March 2000. Mr. Ba's testimony confirmed that he and Ms. Howard reconciled after the CPO took effect on December 29, 1999. He testified that he and Ms. Howard lived together, at times, from January 2000 to late March 2000.

Ms. Howard stated that: "As of March, the end of March, [Mr. Ba] knew [their relationship] was completely over." She also pinpointed the moment the relationship ended as "[m]id-March." Furthermore, she recalled that after the relationship ended in March, Mr. Ba "showed up at [her] job. [She] called the police, and the next day Mr. Ba issued a restraining order against [her]."

Ms. Howard's testimony addressed the specific incident which led to the one count charge against Mr. Ba, alleging his violation of the CPO dated December 29, 1999. That event occurred on May 13, 2000. On that day, Ms. Howard received a phone call at approximately 2:20 a.m. The caller hung up without speaking. Ms. Howard's caller identification box informed her that the call came from a pay phone; she then "beeped" Officer Wayne David who had previously responded to her complaint about Mr. Ba. When Officer David re-

convicted on two of the counts involving con-

tacting and spending time with Ms. Howard.

turned her call, she "asked him if he would, on his way off duty, ... stop by [her] home just to make sure everything was okay." While she was waiting for Officer David, she looked out of a window of her residence and observed a car that resembled Mr. Ba's; she "saw a male in the car."

Ms. Howard continued recounting the events of May 13, saying that: "[A]fter maybe 20 or 30 minutes had passed with nothing ... well, I saw a black car drive up to the driveway. And I peered out of the window again, and the person just sat in the car." The person in the unmarked car was Officer David. Ms. Howard went outside when she recognized the officer as he illuminated his unmarked vehicle, and told him that she thought she saw Mr. Ba's car, but "had heard nothing from him for the last 20 minutes or so."

After Officer David left, and as Ms. Howard "was putting the key in the lock of the gate" to re-enter, Mr. Ba appeared, approached and came "within six feet" of Ms. Howard. As Ms. Howard "tried to get in the door," Officer David returned and inquired whether the man standing near Ms. Howard was Mr. Ba. When Ms. Howard "replied yes," the officer "pulled out his weapon." At that time, Mr. Ba was about "ten feet, twelve feet" from Ms. Howard. Officer David arrested him.

During his testimony, Mr. Ba also explained why he sought a CPO against Ms. Howard in March 2000, and why he went to her home on May 13, 2000:

Every time we have an argument, and when she was living with me at my home, [she said,] "I'm going to the Court and I will lock you down[.]" ... I [went to the Court.] I talked to the Clerk, to the Court. I got the papers here, and I told them she was back living with me three months but now she's (indiscernible), she will go out here and file, say I

violate the protection order .... And I came over here, and I talked to the judge, so that she—I talked to the lady. She told me fill, fill [out] this [petition for civil] protection [form] is the reason why I did it.

He went to Ms. Howard's residence on May 13, 2000, "just to talk to her ...." When he "walked toward her ..., and ... [said], how you can do this[,] ... she started screaming." At that point, the officer intervened and arrested him.

The trial judge expressed the view that Mr. Ba had "just made a judicial admission of guilt ...." Defense counsel replied that: "[T]he defense is ... that this was not a willful violation because of the fact that Ms. Howard in fact [caused] him to violate this order by changing their living arrangements. She lived with him during the time this order was in place from time to time." The trial judge retorted, in part: "The Court's understanding is that judicial orders are to be followed unless they're changed by the Court. People can't unilaterally decide to disobey Court orders."

The judge went on to find Mr. Ba guilty beyond a reasonable doubt of violating the CPO. In finding Mr. Ba guilty, the trial judge said, in part:

The Court finds that at the date and time in question you did in fact violate the protective order. The Court was very sympathetic to the situation right up to the March date, it might very well have not been convinced beyond a reasonable doubt. [Ms. Howard's] conduct is not very commendable, nor is yours, although I, the Court credits her testimony .... The Court is satisfied that going at the time of night to establish a relationship or conduct after six weeks so egregious so that it shows a willful violation of the order and finds you guilty as charged.

The court then scheduled sentencing for late September 2000.[4]

## ANALYSIS

Mr. Ba primarily contends that Ms. Howard consented to the violation of the CPO when they reconciled shortly after the CPO was issued against him. Thus, he asserts, the CPO no longer had legal effect when he entered her property in May. Furthermore, he maintains that Ms. Howard's consent is a valid defense to all subsequent violations of the December 29, 1999, CPO, and that, in any event, he did not willfully violate the CPO as evidenced by his attempt to have the order vacated after his reconciliation with Ms. Howard. The Public Defender Service ("PDS") as amicus in essence urges the court to view the matter as an intrafamily offense, and to recognize the equitable defense of "unclean hands" on the part of the complainant. Specifically, PDS argues that: "Because equitable relief by nature is based on interests of justice and not merely the existence of legal rights, courts should not grant such relief 'when a party has engaged in conduct utterly inconsistent with the orderly administration of justice.' "[5] Therefore, PDS contends that in this case:

> Because the petitioner's consensual reconciliation over several months with Mr. Ba constructively and permanently modified the protection order, consent was available to Mr. Ba as a defense to the CPO violation charge regardless of whether he and the petitioner eventually broke off their relationship in March 2000.

The government argues that this court need not reach the "consent" issue essentially because Mr. Ba and Ms. Howard "could not, by their own conduct, void the CPO." However,[1] the government asserts that if the court reaches the issue, "it should reject consent as a defense" to the CPO for a variety of reasons, including the need to "enforce the authority of the court that issued the order[,]" the difficulty of "determin[ing] whether consent to renewed contact has been freely given[,]" and "the incentive" that the subject of a CPO "would have . . . to contact the complainant indirectly or even to risk direct contact in the hope of gaining an agreement to reconcile."

Under D.C.Code § 16–1005(f), violation of a CPO is punishable as criminal contempt. Although D.C.Code § 16–1005(g) does not use the word "contempt," it specifies that a violation of a CPO order is punishable by a fine not exceeding $1,000, or incarceration for not more than 180 days, or both; which is the same penalty that is set forth in the CPO warning that a violator may be prosecuted for criminal contempt.[6]

■ We may not reverse the trial court's findings of a CPO violation " 'unless they are without evidentiary support or plainly wrong.' " *Jones v. Harkness*, 709 A.2d 722, 723 (D.C.1998) (quoting *In re Vance*, 697 A.2d 42, 44 (D.C.1997) (internal quotation marks and other citation omitted)). " '[W]e must view the evidence in the light most favorable to sustaining the judgment.' " *Id.* However, "[w]hether the acts in which the defendant was found to have engaged constitute [a CPO violation] . . . is a question of law, and we review the trial court's resolution of that question *de*

4. Mr. Ba was sentenced to 90 days in jail.

5. Citation omitted.

6. Even though the charging sheet generally cites D.C.Code § 16–1005, the government indicates that the prosecution of Mr. Ba was brought under § 16–1005(g). The elements of the CPO violation are the same under subsection (f) and subsection (g).

novo." *Fields v. United States,* 793 A.2d 1260, 1264 (D.C.2002) (citing *Brooks v. United States,* 686 A.2d 214, 219 (D.C. 1996)).

■ To establish the elements of a CPO violation, the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order. Since § 16–1005(g) is a general intent statute, "[P]roof of the intent element of . . . only requires proof that the appellant intended to commit the actions constituting [violation of the court order]." *Grant v. United States,* 734 A.2d 174, 177 n. 6 (D.C.1999) (citing *Jones v. Harkness, supra,* 709 A.2d at 723–24).

■ The purpose of the CPO proceeding is to protect the moving party, rather than to punish the offender. *Cruz–Foster v. Foster,* 597 A.2d 927, 930 (D.C. 1991). From this premise, as the trial court recognized, Mr. Ba arguably had a valid defense of consent when he and Ms. Howard reconciled between January and March 2000, particularly since Ms. Howard testified that there were times when she would stay at Mr. Ba's residence after the CPO was entered. The parties and amicus raise serious and complex issues regarding the consent defense and the frustration of the CPO by a party who seeks the order. We need not address those issues in this case, however, because we are satisfied that on the facts of this case, any consent by Ms. Howard during the January to March 2000 period would not establish her consent after late March 2000. Indeed, the evidence establishes, beyond a reasonable doubt, that Ms. Howard revoked her consent to violation of the CPO.[7] As of late March, Ms. Howard and Mr. Ba had no consensual contact. In fact, according to the undisputed evidence, Mr. Ba tried to approach Ms. Howard at work and she reacted by calling the police. At this point, Ms. Howard's consent to the violation of the CPO, if such consent was possible, was effectively revoked. Moreover, Mr. Ba unsuccessfully sought to vacate the CPO in March. Thus, when he approached Ms. Howard on May 13, he clearly knew that the one-year CPO had not been vacated.

■ Finally, Mr. Ba's contention that there was insufficient evidence to establish his violation of the CPO is unpersuasive under the circumstances of this case. The trial court found that notwithstanding the earlier reconciliation from January to March, 2000, Mr. Ba's conduct in violation of the CPO in the early hours of May 13, 2000, was willful, and resulted in a violation of the CPO. *See Grant, Jones, supra,* and *Mabry v. Demery,* 707 A.2d 49 (D.C. 1998). On the record before us, the trial court's findings are not "without evidentiary support or plainly wrong." *Bethard v. District of Columbia,* 650 A.2d 651, 654 (D.C.1994) (per curiam). The CPO ordered Mr. Ba to "stay at least 100 feet away from [Ms. Howard], [her] home, [and her] workplace." In the early hours of May 13, 2000, Mr. Ba stood within at least ten or twelve feet of Ms. Howard, a clear violation of the CPO. In addition, even though the CPO ordered Mr. Ba not to contact Ms. Howard "in any manner," he went to her home and spoke with her on May 13, 2000, another clear violation of the CPO.

---

7. *But see Manesa v. Myers,* 419 U.S. 449, 458, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) ("The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.' ") (quoting *United States v. United Mine Workers,* 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947)).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*