Lawrence DAVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CM–479.

District of Columbia Court of Appeals.

Submitted Oct. 9, 2003.

Decided Oct. 30, 2003.

David S. Stein, was on the brief for appellant.

Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, and Mary R. Pipitone, Assistant United States Attorneys, were on the brief for appellee.

Before SCHWELB and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Following a bench trial, Lawrence Davis was found guilty of violation of a civil protection order by failing to complete a Domestic Violence Intervention Program (DVIP). *See* D.C.Code §§ 16–1005(f) and (g) (2001). The prosecution was precipitated by Davis' failure to attend a DVIP class a few days after the death of his wife, who was alleged to have been murdered. On appeal, Davis claims that the evidence

was insufficient to support his conviction. We agree and reverse.

## I.

### THE TRIAL COURT PROCEEDINGS

On September 23, 1998, a judge of the Superior Court entered a "Consent Civil Protection Order Without Admissions" in the case of *Elizabeth Singleton v. Lawrence Davis*, IF No. 2488–98. The petitioner, Ms. Singleton, now deceased, was Davis' estranged wife. The typed portion of the order provided, in pertinent part, as follows:

> Respondent shall enroll in and complete a counseling program for ... domestic violence .... Respondent shall enroll in the designated program(s) TODAY, in the Probation Office, Room 4206 of the D.C. Superior Court.[1]

On April 21, 1999, the United States Attorney filed a criminal information alleging that on or about March 11, 1999, Davis "willfully violated" the provision of the civil protection order requiring him to "enroll in and successfully complete the [DVIP]," contrary to "Section 16–1004, 16–1005, District of Columbia Code."[2] Davis entered a plea of "Not Guilty," and the case was tried on March 27, 2000.

The prosecution presented the testimony of two witnesses: Bernard Matthews, a part-time domestic violence intervention counselor at Family and Child Services (FACS), and Barbara Bordinaro, FACS' Director of Mental Health Services.

Matthews first described the operation of the DVIP program. He explained that each participant was required to attend twenty-two classes, and that "an individual, upon missing four classes, is to be terminated from the class." He elaborated:

> If three classes are missed, it's understood that the fourth class will result in termination. Now, should, however, an individual miss four classes ..., if an individual would provide some reason for having missed those four classes and if the excuse is a valid one, such as "I was having to go out of the country to visit a loved one" or something like that. And it depends on how a person has been progressing within the class.

Matthews testified that the classes met once a week for 1½ to 2 hours, and that in order to monitor attendance, he maintained a sign-in sheet. According to Matthews, each class member was required to "take an orientation [at] the Superior Court, [a]t [which] they are told when they are to attend and the requirements of the training." Matthews then provided the members of the class with a "mini-orientation" on the first day of the program.

Matthews testified, on the basis of the sign-in sheets, that

> [Davis] attended January the 20th, January the 27th, he was absent February the 3rd, he attended February the 10th, absent February the 17th, present February the 24th, absent March 3rd. Classes were canceled on March 10th, he was absent on March 17th, present on March 24th, absent on March 31st.
>
> Q What happened after March 31st, sir?
>
> A After March 31st, there was a series of absences in which Mr. Davis did not show [up for] class.

---

1. Handwritten to the right of the foregoing text were the words "When Respondent is released from jail." The word "TODAY" was not crossed out. No issue has been raised with regard to the apparent contradiction in the order.

2. On August 5, 1999, the information was dismissed for want of prosecution because the government was not ready for trial. The information was refiled on November 12, 1999.

Q How many times was he absent after this? Was he still enrolled in the class, or had he been terminated from the class?

A Well, at that point, since he had missed three full classes, then he was terminated from the class.

The parties then stipulated, at the suggestion of the prosecution, that "as of the date of March 11[th] ... the defendant had missed three classes."[3]

Matthews was also questioned regarding the death of Davis' wife. He testified that, some time in March 1999, he had a discussion with Davis about Davis' recent bereavement.[4] He stated that the death of a spouse "could be an extenuating circumstance" when a participant missed a class. According to Matthews,

Mr. Davis did return to class. And I was concerned about, after knowing about the death of his wife, I did not want him discussing issues relative to abusive situations that might cause some pain for him, so I was sensitive to that, and that is why I approached him and said to him, "should we have a discussion like this? Is this something you feel you can deal with?" And he said he could.

Q How many classes had he missed at the time of that conversation?

A Up to that time he had missed, I think, three classes. It had to be three classes.

Matthews testified that he did not recall excusing Davis from any classes.

Ms. Bordinaro testified that the DVIP was one of three programs that she supervised. She explained that participants in the program attend a four-week orientation at the Superior Court at which "all the rules and regulations are laid out." She indicated that she was personally unfamiliar with the documents used to monitor attendance at the DVIP. In response to the prosecutor's question regarding "what happens if a participant misses classes," she stated that "[i]t's complicated, so I'm going to think it through as I am speaking." She continued:

The 22 sessions are divided into semesters, half and half, 11 and 11. The person who comes to the course can have up to two excuses during the first 11 weeks, but they have to make those classes up.... No-shows are very serious in the program, because if you have no-shows you get dropped from the program, and it's been set up not by Family Services, but rather by the [c]ourt system, and we follow the rules that they have.

... But if the men miss more than two times each semester, they are dropped from the program, which is the [c]ourt's rule, not ours.

Ms. Bordinaro did not testify that she had explained these rules to Davis, and, as far as the record reflects, she had no personal contact with him.[5] She indicated that if "the client would call in, say 'somebody died,' something like that[,][t]hat's very different [from] someone who just doesn't show up."

At the conclusion of Ms. Bordinaro's testimony, Davis' attorney moved for a judgment of acquittal (MJOA), which the judge denied. Davis then testified that his wife

---

**3.** It is undisputed that after March 30, Davis could not attend classes because he was incarcerated for parole violation.

**4.** Matthews "assumed" that this conversation took place on March 24, 1999, which was the last date on which Davis attended a class.

**5.** Ms. Bordinaro was asked whether she knew about the death of Davis' wife. She responded: "I know about it now, but I didn't then."

died at the beginning of March 1999.[6] He stated that "around March 3," he talked to Mr. Matthews "about my wife's passing and me not coming to class." According to Davis, Matthews

> said it was okay, and if anything they can do, get with him and let him know, oh and let him know where the funeral will be so he can come to the funeral.
>
> Q And as far as your next appearance, did he tell you that you must attend, or did he excuse you?
>
> A He excused me.

Davis further stated that he was excused from attending two classes.[7] He attended class on March 24, but did not attend on March 31 because he had been arrested on the previous day for parole violation. Davis testified that he has been detained ever since.

The defense rested and, when the prosecutor said that he had no rebuttal,[8] the judge immediately asked for the parties' closing arguments. After counsel's arguments had been concluded,[9] the judge found, without further elaboration, that Davis was guilty of violating the CPO. The judge subsequently sentenced Davis to serve 180 days, with all but sixty days suspended pending a one-year period of probation, and she ordered Davis to pay $50 to the Crime Victims' Compensation Fund.[10] This appeal followed.

## II.

## LEGAL ANALYSIS

A. *Statutory background and elements of the offense.*

At all times relevant to this appeal, our CPO statute provided in pertinent part as follows:

> Violation of any temporary or permanent order issued under this subchapter ... shall be punishable as contempt.

D.C.Code § 16–1005(f) (2001).

> Any person who violates any protection order issued under this subchapter shall be chargeable with a misdemeanor and upon conviction shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 180 days, or both.

---

**6.** His testimony as to the date in March on which his wife died is described in the transcript as "indiscernible." It appears from his other testimony, however, that she must have died prior to March 3.

**7.** Davis also claimed, however, that Matthews "said to come back whenever I felt better."

**8.** The lack of any rebuttal left the state of the testimony as to excused absences as follows: Davis claimed that there were at least two, and Matthews did not recall any.

**9.** During his oral argument, after contending that Davis was guilty because he missed more than two classes during the first eleven-week semester, the prosecutor made the following rather unusual representation:

> And I'd just like to address briefly, Your Honor. I can tell you have some concern about the fact that his wife passed away and he's now being prosecuted, and I do concede, Your Honor, that it's certainly unusual that the Government would prosecute a case that appears in that posture, where he missed a class after his wife passed away.
>
> It's obviously a question of prosecutorial discretion, Your Honor, and I'll say only that we do have our reasons for going forward with this case, and I do believe we've made out a violation. And although typically we'd be quite sympathetic to a person in a situation like that, in this particular case we have decided to [exercise] our discretion and go forward.

Davis' attorney then made an equally unusual representation; he told the court that his client's wife had been *murdered* on March 1, 1999.

**10.** At the sentencing proceeding, the judge asked Davis' attorney if the alleged murder was related to the case. Counsel responded that Davis had not been indicted and that nobody else had been indicted either.

D.C.Code § 16–1005(g) (2001).[11] The criminal information filed by the United States Attorney in this case does not specify whether Davis was being prosecuted under subsection (f) or subsection (g). We do not believe, however, that the appeal turns on this distinction, for the elements of a CPO violation are the same under the two subsections. *Ba v. United States,* 809 A.2d 1178, 1182 n. 6 (D.C.2002). Although subsection (g) does not use the word "contempt," subsection (f) does. *Id.* at 1182. For all practical purposes, this is a criminal contempt case in which Davis has been charged with intentionally violating a court order.

■■■ "To establish the elements of a CPO violation, the government must present evidence proving beyond a reasonable doubt that defendants engaged in: (1) willful disobedience (2) of a [civil protection] order." *Id.* at 1183. In a criminal contempt case, as in any other criminal prosecution, each element must be proved beyond a reasonable doubt. *Bethard v. District of Columbia,* 650 A.2d 651, 653 (D.C.1994) (per curiam) (citing *In re Gorfkle,* 444 A.2d 934, 939 (D.C.1982)); *Thompson v. United States,* 690 A.2d 479, 482 (D.C.1997). "The offense requires both a contemptuous act and a wrongful state of mind." *Swisher v. United States,* 572 A.2d 85, 89 (D.C.1990) (per curiam); *Fields v. United States,* 793 A.2d 1260, 1264 (D.C.2002) (quoting *Gorfkle,* 444 A.2d at 939).[12]

B. *Standard of review.*

■■■ Our standard of review of any criminal conviction for evidentiary insuffi-ciency is a familiar one, and it applies with equal force here. "We may not reverse the trial court's findings of a CPO violation unless they are without evidentiary support or plainly wrong." *Ba,* 809 A.2d at 1182 (citations and internal quotation marks omitted). In CPO violation cases, *Ba,* 809 A.2d at 1182, as in criminal contempt cases, *In re Vance,* 697 A.2d 42, 44 (D.C.1997), and in criminal cases generally, *Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc), we must view the evidence in the light most favorable to sustaining the judgment. "Judicial review is deferential, giving 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Rivas,* 783 A.2d at 134 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The proof of guilt is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); *Rivas,* 783 A.2d at 134.

■■■ It is important to note, however, that "appellate review of [the] sufficiency of the evidence is [not] toothless." *Rivas,* 783 A.2d at 134. As an appellate court, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [trier of fact] behaving rationally could find it persuasive beyond a reasonable doubt." *Id.*

11. Both subsection (f) and subsection (g) have been amended subsequent to Davis' prosecution to include in their coverage violations of protection orders issued by courts of other jurisdictions. *See* D.C.Code §§ 16–1005(f) and (g) (Supp.2003). These amendments have no bearing on this case.

12. A third element of criminal contempt is "causing an obstruction of the administration of justice." *Thompson,* 690 A.2d at 482 (citing *Bethard,* 650 A.2d at 653) (citing *Gorfkle,* 444 A.2d at 939). No party has raised any issue regarding the applicability of this element to prosecutions for a CPO violation, and we do not address the question.

## C. *Sufficiency of the evidence.*

 Applying the foregoing standards to the evidence in this case, we are constrained to conclude that even if the government showed that Davis violated the CPO, it did not prove beyond a reasonable doubt that he did so willfully. Davis' missing of three classes did not warrant removal from the program under the standards described by Matthews, the only witness with whom Davis had any direct dealings. Matthews testified that a total of *four* absences was required. Although Davis was shown to have missed enough classes to sustain his removal if the standard was as Ms. Bordinaro understood it—no more than two missed classes in either of the two eleven-session parts of the program—there was no evidence that this standard was ever communicated to Davis. Thus, if Davis was informed that the rules were what Matthews testified that they were, he could reasonably believe that missing three classes before March 11—the date specified in the criminal information[13]—would not result in his removal from the program.

An impartial trier of fact could reasonably consider the testimony of Matthews and Ms. Bordinaro together, and could fairly conclude that Davis was not allowed to miss four classes in the entire twenty-two week period (Matthews), or more than two in either half of the program (Bordinaro). But Matthews made no mention in his testimony of the "no more than two in the first eleven weeks" requirement. There is simply no evidence that he was even aware of it. When Matthews provided Davis with a "mini-orientation," there is no reason to believe that he told Davis anything that he (Matthews) did not himself know.

It is, of course, possible that the rules, as understood by Ms. Bordinaro, were explained to Davis at the Superior Court orientation. The prosecution presented no evidence at all, however, as to what Davis was told at that orientation. Moreover, Ms. Bordinaro herself testified that the rules as to missed classes were "complicated;" she and Mr. Matthews evidently understood them differently. It is difficult to ascribe knowledge to Davis that even Matthews evidently did not have, especially when it was Matthews, and not Ms. Bordinaro, who had direct dealings with Davis.

The government was required to establish *beyond a reasonable doubt* that Davis violated the order willfully, *i.e.,* that he had a "wrongful state of mind." *Fields,* 793 A.2d at 1264. "Beyond a reasonable doubt" is the most exacting standard known to the law. As the en banc court explained in *Rivas,* it

> requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused." *Jackson*[, 443 U.S. at 315, 99 S.Ct. 2781]. Proof of a fact beyond a reasonable doubt is thus "more powerful" than proof that the fact is "more likely true than not;" more powerful, even, than proof "that its truth is highly probable." *(Darius) Smith v. United States,* 709 A.2d 78, 82 (D.C. 1998) (en banc) (approving formulation of reasonable doubt as "the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life").

---

**13.** It is true that Davis missed a fourth class on March 17. This occurred, however, after March 11, and, in light of the date of the offense alleged by the government, Davis was not on notice that he had been charged with this absence. In its brief in this court, the government reiterates that, "the March 11 date was correct," but relies on Ms. Bordinaro's version of the rules to argue that three unexcused absences prior to March 11 were sufficient to warrant Davis' removal from the program.

This requirement, a component of due process, " 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Jackson,* 443 U.S. at 315, 99 S.Ct. 2781 (quoting *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

783 A.2d at 133. No impartial trier of fact could, in our view, find beyond a reasonable doubt that Davis knew or understood, or should have known or understood, his responsibilities as described in Ms. Bordinaro's testimony, when these responsibilities differed from those known to and testified to by Matthews. Accordingly, the judgment of conviction is reversed, and the case is remanded to the trial court with directions to enter a judgment of acquittal. The mandate shall issue forthwith.

*So ordered.*