*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CM-655

IN RE MICHAEL CURTIS, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(CCC-15-17)

(Hon. Judith Smith, Trial Judge)

(Submitted November 8, 2018                Decided April 28, 2022)

*Emily E. Cunniff* for appellant.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, *Rosalyn Calbert Groce*, Deputy Solicitor General, and *Janice Y. Sheppard*, Assistant Attorney General, for the District of Columbia.

Before GLICKMAN, BECKWITH, and MCLEESE, *Associate Judges*.

Dissenting opinion by *Associate Judge* BECKWITH at page 13.

PER CURIAM: Appellant Michael Curtis was convicted of criminal contempt for violating a civil protection order (CPO) by communicating with his ex-wife, Priscilla Johnson. Mr. Curtis argues that there was insufficient evidence to support his conviction. We affirm.

## I.

Except as otherwise noted, the following appears to be undisputed. Mr. Curtis and Ms. Johnson had three children together. They divorced in 2014 or 2015, and Ms. Johnson obtained a CPO against Mr. Curtis in 2016. The CPO generally required Mr. Curtis not to contact Ms. Johnson by telephone, in writing, electronically, or in any other manner, directly or indirectly through a third party. The CPO did, however, permit Mr. Curtis to text Ms. Johnson "ONLY to discuss matters related to the children in common."

Mr. Curtis's contempt conviction is based on the following exchange of texts in early 2017:

MR. CURTIS: Pri its not on court papers that i cant talk to the children. ..u have taken all rights and respect from mothers who r truly in need of help… Its ur fault young ladies r hurt..

MS. JOHNSON: Please stop texting this. I have given u two options n u refused both. So it's ur choice. The end of conversation please. I will no longer debate over this.

MR. CURTIS: Sorry for trying to my children and it should never be 2

choices…so im given u 3 Choices. .

MS. JOHNSON:   I'm not being spiteful. This is wat I can afford.

MR. CURTIS:   That's one…  It don't cost for my children to talk to me…  U passed spiteful…

MS. JOHNSON:   It's a monthly cost to pay a phone bill. Our minutes are limited since u turned of [name of daughter] phone we have to share n I need to be sure I'm able to reach them. But u won't understand so please this is the end. I'm trying to allow u to communicate but I'm having second thoughts now because u are constantly trying to cause confusion.  I will say for a final time I need help with the bill to extend the minutes or u can get them a line for u to contact them.  f u can't wait nderatand then I won't allow u to waste my text allowance n I'm going to have to ask u to stop contacting me period. It's ur fault u refuse to help so please don't blame me. If you can't text appropriately then I will not allow u to text me at all. Thx n goodnight.

MR. CURTIS:   I don't care about phone bills. …  I'm 14 houses away. . but u have hurted me for 4 yrs.  Now and now all will be revealed. ..  Be sure to tell them about ur cousin. ..even my babys no about it and who he was. Supposed to be so I will be calling. Them in fack I got a better idea. ..

MS. JOHNSON:   Thx.  Please don't text me again at all. I've asked u not to threaten me and this is not a conversation related to the well being of our children. Do not contact me again please.

MR. CURTIS:   I did not treat. .. I promise u someone going to.  Jail for the pain i been.  Through over 4 yrs

MS. JOHNSON:   Ok. That's it. No more. I'm trying to sleep.


At trial, Ms. Johnson acknowledged that some parts of that exchange had to do with the children.  Ms. Johnson also testified, however, that the exchange included threats and other comments that Ms. Johnson did not understand.

According to Ms. Johnson, the "dominant issue" in the texts was Mr. Curtis becoming angry.

The trial court found Mr. Curtis guilty. The trial court focused on three specific statements: (1) "its ur fault young ladies r hurt"; (2) "u have hurted me for 4 yrs. Now and now all will be revealed"; and (3) "I promise u someone going to. Jail for the pain I been. Through over 4 yrs." The trial court noted that those statements were in the midst of other statements about the children and might have reflected frustration relating to the children. Nevertheless, the trial court found that those three specific statements were not about the children and thus violated the CPO.

## II.

To establish the elements of criminal contempt for violating a CPO, the evidence must prove beyond a reasonable doubt that the defendant "engaged in (1) willful disobedience (2) of a protective court order." *Holman v. District of Columbia*, 202 A.3d 512, 521 (D.C. 2019) (internal quotation marks omitted). Mr.

Curtis argues that the evidence did not establish that his texts were in violation of the CPO. We disagree.

The trial court focused on three statements in concluding that Mr. Curtis violated the CPO. Under our case law, we cannot affirm Mr. Curtis's conviction unless all three statements violated the CPO. *See, e.g.*, *In re Kraut*, 580 A.2d 1305, 1313-14 (D.C. 1990) (reversing where trial court based single count of contempt on three grounds and evidence was insufficient as to at least one ground). It is not entirely clear whether we should review the trial court's conclusions about the three statements deferentially or de novo. *Compare, e.g.*, *Thomas v. United States*, 934 A.2d 389, 392 (D.C. 2007) (In criminal-contempt cases, "[j]udicial review is deferential, giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.") (internal quotation marks omitted), *with, e.g.*, *id.* ("Whether the acts in which the defendant was found to have engaged constitute [criminal contempt] is a question of law, and we review the trial court's resolution of that question *de novo*.") (brackets and internal quotation marks omitted). We need not decide that question, because we agree with the trial court that the three statements violated the CPO.

The first statement at issue is "its ur fault young ladies r hurt." Considered in isolation, that statement bears no apparent relation to the children. The statement must be understood in context, however. *Cf., e.g.*, *Andrews v. United States*, 125 A.3d 316, 324 (D.C. 2015) (in determining whether words constituted threat, "[t]he words in question must be considered in the context in which they were used") (internal quotation marks omitted). It is true that the statement is part of a text message that starts with Mr. Curtis stating his view of his legal right to communicate with the children. Mr. Curtis immediately veers, however, from that specific topic to more general statements that have no apparent logical relationship to the children. Mr. Curtis states, without explanation, that Ms. Johnson has taken away "all rights and respect" from mothers in need. Then, more ominously, Mr. Curtis states without explanation that it is Ms. Johnson's fault that "young ladies" are hurt. We agree with the trial court that the latter statement was not "ONLY to discuss matters related to the children in common."

This court has affirmed a conviction for criminal contempt in circumstances comparable to those of the present case. *In re Ferguson*, 54 A.3d 1150 (D.C. 2012) (per curiam). In *Ferguson,* the CPO permitted communication "[o]nly regarding the

child and announcement for pick up and return of the child." *Id.* at 1151. In a phone call on Christmas Eve, Mr. Ferguson said that their child had bought a present for the complainant. *Id.* Mr. Ferguson asked if the complainant would be home to receive it, and, after the complainant said she would not, Mr. Ferguson asked again whether complainant would be home. *Id.* This court held that "[t]he evidence presented was sufficient to permit the trial court to find that [Mr. Ferguson's] further question to [the complainant] was not genuinely 'regarding the child,' but instead represented an effort to have contact with [the complainant] outside the bounds permitted under the CPO." *Id.* at 1153.

Courts outside of this jurisdiction have come to similar conclusions in analogous cases. *See Jordan v. State*, 77 N.E.3d 1271, 1273-74 (Ind. Ct. App. 2017) (upholding conviction for violating CPO permitting contact about parenting order; voicemail containing ad hominem attacks including that defendant would "really tear [complainant's] ass up in court" and would tell court "everything that has [gone] on" exceeded the scope of what was necessary to communicate with complainant about parenting time); *State v. Peric*, Nos. 2018-L-089, etc., 2019 WL 1424626, at *2, *8 (Ohio Ct. App. Mar. 29, 2019) (upholding conviction for violating CPO that permitted contact "for all issues concerning minor children," where Mr. Peric sent message that referenced parenting time but also called complainant "evil hateful

bitch"; CPO did not "extend to personal attacks"; limited-contact provision's "intent is not to allow [Mr.] Peric to send messages threatening lawsuits and prison time based on a perceived underlying conflict over the children. This is an unreasonable interpretation of the order. Under this interpretation, [Mr.] Peric would have license to say anything to [complainant] provided he mentioned the children in the message."); *State v. Putman-Albright*, Nos. 26679, etc., 2016 WL 525863, at *7-8 (Ohio Ct. App. Jan. 29, 2016) (upholding conviction for violating CPO that permitted contact "concerning parenting issues," where, during dispute about parenting issue, Ms. Putman-Albright called complainant "punk ass" and asked if complainant was afraid of Ms. Putman-Albright's brother).

We are not persuaded by Mr. Curtis's arguments that his statements did not violate the CPO. First, Mr. Curtis appears to suggest that the relevant question is whether the text messages as a whole were primarily about the children. We disagree. The CPO limits communication to a single topic. In our view, it would not be reasonable to interpret the CPO to allow Mr. Curtis to say whatever he wished as long as he embedded his statements in a larger conversation that was in part -- or even primarily -- about the children.

Second, Mr. Curtis appears to argue that his statement about young ladies being hurt related to the children in the sense that the statement reflected his frustration about the extent of his access to the children.  Mr. Curtis did not testify, and we do not have direct evidence about why he made the statement about young ladies being hurt.  We assume for current purposes, however, that the statement was motivated by Mr. Curtis's frustration about a matter relating to the children.  Nevertheless, we conclude that it would not be reasonable to interpret the CPO to permit Mr. Curtis to say whatever he wanted as long as his statements were motivated by frustration about matters relating to the children.

Our analysis of the remaining two statements is similar to our analysis of the first statement.  The second statement is "I'm 14 houses away. .but u have hurted me for 4 yrs.  Now and now all will be revealed. .."  That statement in isolation does not appear to relate to the children.  Rather, the statement appears to express generalized anger about the interactions between Mr. Curtis and Ms. Johnson over a four-year period.  Mr. Curtis suggests on appeal that the reference to four years reflects Mr. Curtis's unhappiness at having "suffered through the litigation concerning the children" for four years.  No evidence directly supports that suggestion, however.  To the contrary, Ms. Johnson and Mr. Curtis were divorced no more than three years before the statements at issue, and the CPO was issued about a year before the

statements. The evidence thus undermines rather than supports Mr. Curtis's suggestion that this statement was limited to a dispute concerning access to the children.

The second statement also seems to include an unclear threat to disclose unfavorable information about Ms. Johnson. Mr. Curtis suggests on appeal that the statement reflects his intent to provide information to the court at the next custody hearing. No evidence directly supports that suggestion, however, and the immediately subsequent statements in the text message seem to contradict the suggestion. Those statements (1) cryptically direct Ms. Johnson to tell unspecified people about Ms. Johnson's cousin and "who he was . . . [s]upposed to be"; and (2) state that Mr. Curtis was going to call those unspecified people. We conclude that the second statement was not "ONLY to discuss matters related to the children in common."

Finally, the third statement was "I promise u someone going to. Jail for the pain i been. Through over 4 yrs." That statement does not explicitly refer to the children. Rather, the statement appears to express generalized anger about the interactions between Mr. Curtis and Ms. Johnson over a four-year period. Mr. Curtis

suggests on appeal that the reference to jail reflects Mr. Curtis's intent to have Ms. Johnson held in criminal contempt and incarcerated for violating a court order concerning the children. No evidence directly supports that suggestion, however. To the contrary, the broad reference to four years of "pain" and the cryptic reference to "someone" going to jail seem to reach far more broadly. In addition, the reference to an unspecified person going to jail is rather ominous, given Mr. Curtis's earlier statement about young ladies being hurt. In sum, we conclude that the third statement was not "ONLY to discuss matters related to the children in common."

The dissent does not directly address the sole issue raised by Mr. Curtis and decided in the foregoing discussion: whether Mr. Curtis's texts violated the CPO. Rather, the dissent concludes that there was insufficient proof that Mr. Curtis acted willfully, because "the record is devoid of evidence that Mr. Curtis knew the texts violated" the CPO. *Infra* at 14. Because Mr. Curtis did not raise the issue of willfulness, we would not normally address the issue. *See, e.g.*, *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.").

We take as a given that this court has authority to sua sponte address issues not properly raised on appeal, in extraordinary circumstances and to prevent injustice. *Cf., e.g., Parker v. United States*, 254 A.3d 1138, 1146 (D.C. 2021) (describing case in which appellate court exercised discretionary authority to consider issue not properly presented on appeal, because "injustice might otherwise result if [appellant is] . . . punished for conduct that does not constitute a crime") (internal quotation marks omitted). We respectfully disagree with the dissent, however, that this is such a case.

Mr. Curtis never explicitly stated that he knew his texts violated the CPO. Willfulness, however, "is a state of mind, and in most cases it cannot be proved directly." *Thompson v. United States*, 690 A.2d 479, 483 (D.C. 1997). Essentially for the reasons we have already explained, we conclude that a reasonable fact-finder could infer that Mr. Curtis knew that his texts were not "ONLY to discuss matters related to the children in common."

Finally, raising concerns about the adequacy of the trial court's findings, the dissent suggests that a remand is warranted. *Infra* at 22 & n.6. Mr. Curtis has not challenged the adequacy of the trial court's findings and has not requested a remand.

We see no extraordinary circumstances justifying sua sponte consideration of the issue. The trial court's findings appear to reflect the view that Mr. Curtis could not reasonably have thought his texts complied with the CPO. For example, the trial court found that the texts were "well beyond what would be communication about the children," and the trial court also said that it "cannot reasonably find that [the texts] are about matters about the children." There is no particular reason to believe that a sua sponte remand for further findings would change the outcome of this case. *Cf., e.g.*, *Workman v. United States*, 255 A.3d 971, 979 (D.C. 2021) (with respect to issue properly presented on appeal, court declines to remand where it was clear that trial court would reach same result if matter were remanded).

For the foregoing reasons, the judgment of the trial court is

*Affirmed*.

BECKWITH, *Associate Judge*, dissenting: Though Michael Curtis was not charged with any sort of threat or assault, the majority sees something "ominous" in the text messages Michael Curtis sent to Priscilla Johnson, and this impression informs its view that the messages discussed "matters" that were *not*, as the civil protection order required, "related to the children in common." The messages are

ambiguous, though, and could come across as either unremarkable or alarming, depending greatly upon one's background and experiences. But even if the messages did exceed the bounds of what the CPO allowed by discussing matters that were not related to the children in common, the record is devoid of evidence that Mr. Curtis knew the texts violated the order and thus had the necessary "wrongful state of mind." *See In re Jones*, 898 A.2d 916, 920 (D.C. 2006) (citing *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003)). As an initial matter, the CPO's language failed to put Mr. Curtis on notice that some of his text messages fell outside the scope of permissible communication. Further, there is no evidence that the trial court ever clarified the parameters of the exception. And finally, nothing in these messages is so blatantly off topic as to demonstrate, in the absence of other evidence, Mr. Curtis's willfulness to discuss matters not related to his children. Because the government's evidence was insufficient to prove this essential element of the crime of contempt, I respectfully dissent from the majority's decision to affirm Mr. Curtis's conviction for violating the civil protection order.

In the context of contempt of a CPO, "[w]illfulness necessarily entails knowledge that conduct is proscribed," *Williams v. United States*, 51 A.3d 1273, 1280 (D.C. 2012), and "a defendant cannot be convicted of criminal contempt where he or she is not put on notice of the specific conditions of the [CPO] order." *Vaas*

*v. United States*, 852 A.2d 44, 46 (D.C. 2004); *In re Thompson*, 419 A.2d 993, 996 (D.C. 1980) ("One cannot be contemptuous of a court order if he has no knowledge of it."). Before the government can demonstrate contempt of a court order, then, that order must be "specific and definite, or clear and unambiguous." *In re Jones*, 898 A.2d at 920 (quoting *Fed. Mktg. Co. v. Va. Impression Prods. Co.*, 823 A.2d 513, 523 (D.C. 2003)).

At least twice in circumstances analogous to those here, this court has reversed a contempt conviction for insufficient proof of willfulness because of uncertainty over exactly what conduct the court order forbade. In *Davis v. United States*, the government charged Lawrence Davis with contempt for nonattendance of a domestic violence intervention program the CPO required him to attend. 834 A.2d at 863. One of the government's witnesses testified that missing more than two classes caused attendees to be "dropped from the program," while the person who had informed Mr. Davis of the program requirements testified that after three missed classes, "a fourth class w[ould] result in a termination." *Id.* at 863–64, 867. Because the government presented no evidence that the more stringent three-absence standard was ever communicated to Mr. Davis, we held that the government had not proven beyond a reasonable doubt that Mr. Davis had a "wrongful state of mind." *Id.* at 867 (quoting *Fields v. United States*, 793 A.2d 1260, 1264 (D.C. 2002)). Thus, "[n]o

impartial trier of fact could . . . find beyond a reasonable doubt that [Mr.] Davis knew or understood . . . his responsibilities" under the CPO. *Id.* at 868.

The government similarly failed to prove willfulness in *In re Jones*, where Maurice Jones was convicted of violating the no-contact provision of a CPO when he walked near the petitioner at a court hearing and said either "watch it" or "watch out." 898 A.2d at 919–20. There, we held that the evidence was insufficient to prove that Mr. Jones knew that his conduct would violate the CPO. That is, the terms of the order, which prohibited contact "in any manner," failed to put Mr. Jones on notice of how he should conduct himself when he and the petitioner were both in the courtroom, and the words he uttered did not in themselves establish that Mr. Jones intended to violate the order. *Id.* at 918, 920–21.

Here, it is true, as the trial court stated, that Mr. Curtis "knew of the order" because "he was served with a copy . . . in open court." But that does not end the analysis. As in *Davis* and *Jones*, the government here "fail[ed] to demonstrate how the terms of the CPO, as applied to the facts before us, put [Mr. Curtis] on notice that his actions would constitute a violation of the CPO." *Jones*, 898 A.2d at 921.

At the outset, in permitting Mr. Curtis to communicate with Ms. Johnson through text messages "to discuss matters related to the children in common," the

CPO did not specify to what extent "*matters related to* the children" expanded the permissible subject matter beyond discussion strictly about the children. That the court and the parties at times paraphrased the exception[1] underlines the imprecision of the description of what conduct was allowed. And though the shorthand references were similar, even slight differences can be "susceptible to very different meanings." *Vaas*, 852 A.2d at 47 (finding that the trial court's simultaneous usage of "one-block radius" and "one-block area" "created an ambiguity regarding the exact area from which Vaas was barred"). In some respects, the alternative phrasing employed at trial appears to be narrower than the CPO's actual wording, which permitted Mr. Curtis to text Ms. Johnson to discuss not just the children, but "matters related to" them.[2] *See In re Ferguson*, 54 A.3d 1150, 1154 n.4 (D.C. 2012) (rejecting

---

[1] The trial court concluded at one point, for example, that the texts were "not about the children in common." The prosecutor referred to texts that "ha[d] to do with" the children or that communicated "about" the children. And defense counsel referred to subjects that "concern[ed] matters concerning the children."

[2] Similarly, in holding that portions of Mr. Curtis's texts were not "limited to a dispute concerning access to the children," *supra* at 10, and did not "explicitly refer to the children," *supra* at 11, the majority seems to suggest, contrary to the actual terms of the CPO, that the CPO restricted Mr. Curtis to communicating about the children directly as opposed to discussing matters relating to the children. Further, someone reading such an order may fairly have interpreted language permitting the discussion of matters "related to" the children as encompassing a somewhat wider range of subjects than matters "about" the children. Merriam-Webster's definition of "about," as used in this context, is "with regard to," "concerned with," or "fundamentally concerned with or direct toward." Merriam-Webster Online, https://www.merriam-webster.com; https://perma.cc/K3TZ-3EMC (last visited April 6, 2022). By contrast, it defines "related" as "connected by reason of an

government's argument that a CPO that permitted contact "regarding the child *and* announcement for pick up and return of the child" limited contact to communication for the purpose of visitation rights); *cf. Related*, Black's Law Dictionary (11th ed. 2019) ("Connected in some way . . . .").

To the extent the breadth of the provision is unclear, we "construe ambiguities . . . as redounding to the benefit of the person charged with contempt." *Jones*, 898 A.2d at 922 (citations omitted). It therefore seems essential that the phrase "related to" is "deliberately expansive" and is given a "broad common-sense meaning." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46–47 (1987*)*; *accord District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 (1992).[3] And given the

---

established or discoverable relation." *Id.* Under these definitions, a statement that may not be *concerned with* a certain topic could seemingly still be *connected to* the topic by a discoverable aspect.

The point here is not for dictionaries to govern CPO violation prosecutions; the point is that the government cannot rely on the content of communications alone to establish willfulness when those communications might honestly appear to a defendant to comply with the order under a common understanding of the order's language.

[3] *See also, e.g.*, *Cardell Fin. Corp. v. Suchodolski Assocs.*, 896 F. Supp. 2d 320, 327 (S.D.N.Y. 2012) ("Because 'relating to' in the Amended Judgment is amenable to being read in two different ways, it is ambiguous and the [respondent] cannot be held in contempt for its violation of only one of those possible meanings when its conduct would have been permissible under the other."); *In re Monarch Cap. Corp.*, 173 B.R. 31, 46 (D. Mass. 1994) (finding an order did not describe an

absence of evidence that the provision was clarified or explained to Mr. Curtis, there is no reason to believe the broad language of the CPO was ever narrowed—a conclusion bolstered by the prosecutor's request at sentencing that the court craft a more specific no-contact provision "in an effort to perhaps avoid any confusion about the—regarding the children's provision."  Where, as here, the defendant's conduct is permissible under a reasonable construction of the order, he cannot be found to have willfully violated the order.  *See Jones*, 898 A.2d at 921 ("[I]f a willful violation of the no contact provision depends on a willful violation of the stay away provision, the defendant must be on notice that a failure to keep a particular distance away is itself a violation; otherwise, the stay away basis for the no contact violation will lack willfulness.").

This is not a case where the communications alone demonstrated willfulness. While the court concluded that Mr. Curtis intended to send the texts and that the texts were "a communication that is not about the children in common," it did not find that the texts themselves revealed that Mr. Curtis believed he was texting about matters unrelated to the children in common.  To be sure, a factfinder reasonably could infer that the three texts on which the trial court based its verdict were less

---

injunction's scope in reasonable detail because "the phrase 'arising from or related to' was ambiguous").

than congenial.[4]  But however antagonistic, those texts were part of a conversation that clearly concerned matters related to the children and they did not, *on their own*, support an "obvious" inference of Mr. Curtis's willfulness.  *Jones*, 898 A.2d at 921– 22 (distinguishing cases where the conduct alleged to violate the CPO was itself "outright and blatant" evidence of willfulness).  Even if the CPO was as limited as the majority suggests, it did not specify that arguments or frustration with respect to Mr. Curtis's access to the children would fall outside that scope.  *See also Jones*, 898 A.2d at 920 (finding that "the CPO failed to afford [Mr. Jones] sufficient notice of the manner in which to comport himself upon leaving the well of the courtroom").  Because the texts were insufficient to support an inference of willfulness on their own, and because the record does not otherwise establish that Mr. Curtis knew that his texts would violate the order, the evidence was not sufficient to prove beyond a reasonable doubt that Mr. Curtis willfully violated the order.

---

[4] The majority describes two Mr. Curtis's statements as "ominous[]."  It further suggests that Mr. Curtis's "frustration" about his ongoing custody issues may have motivated the text messages, but that the court could not "permit Mr. Curtis to say whatever he wanted" simply because he was "motivated by frustration about matters relating to the children."  I agree that the CPO did not give Mr. Curtis free reign to say "whatever he wanted" but remain skeptical that the government proved beyond a reasonable doubt that Mr. Curtis intended to communicate about "matters" not "related to the children in common."

The majority declines to address the evidence of willfulness on the ground that it is not before us. While it is true that Mr. Curtis's brief focuses upon the trial court's ruling that his text messages were not related to the children, it is inappropriate here to forgo evaluating the sufficiency of the evidence of willfulness for three reasons.

First, Mr. Curtis did raise the issue. He moved for judgment of acquittal in the trial court,[5] unquestionably challenges the sufficiency of the evidence on appeal, and makes arguments in his appellate brief—such as repeatedly characterizing his text messages as an expression of frustration—that if true, must necessarily be an assertion that he did not willfully violate the no-contact order. Indeed, inherent in his arguments that he was texting Ms. Johnson about matters related to the children

---

[5] This court has held that "a 'full range of challenges' to the sufficiency of the evidence" is "automatically preserved at a bench trial by a defendant's plea of not guilty." *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc) (quoting *Newby v. United States*, 797 A.2d 1233, 1238 n.2 (D.C. 2002)); *see also Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1264 (D.C. 1991) (stating that the grounds for an MJOA "need not be stated with specificity unless the prosecutor so requests"). Though Mr. Curtis was thus not required to challenge the evidence of willfulness in order to preserve the issue for appeal, he did mention intent in his request for a judgment of acquittal, stating that "[w]hen people are communicating regarding an emotional[] issue, things do come up. There's no intention really to talk about anything else. But things do come up." He also implicitly challenged the proof of willfulness when he argued in closing that his text messages signaled frustration over Ms. Johnson's attempts to hinder his relationship with his children.

is the contention that he did not intend to communicate about matters outside the scope of the CPO and was not aware of the wrongfulness of the messages he was sending.[6]

Second, any imprecision in Mr. Curtis's challenge to the evidence of willfulness—which permeates his sufficiency claim even though it does not appear under a heading specifically challenging that element—is a continuation of, and cannot be separated from, the trial court's and the parties' own erroneous understanding of willfulness at trial. In the trial court, the government argued, and the trial court agreed, that the government needed to prove only that Mr. Curtis had a so-called "general intent" to send the text messages, meaning that he did not do so by mistake—something Mr. Curtis has never disputed.[7] But despite the confusion

---

[6] Even if the issue had not been squarely raised, the appropriate course would be to request briefing on the question or to remand to the trial court rather than wholly declining to address it. Contrary to the majority's contention, it is not "clear," *see Workman v. United States*, 255 A.3d 971, 979 (D.C. 2021), or "doubtless," *id.* (quoting *Black v. District of Columbia Dep't of Human Servs.*, 188 A.3d 840, 851 (D.C. 2018)), that the trial court here would find proof beyond a reasonable doubt of willfulness. The findings quoted by the majority—that, in the trial court's view, the texts were "well beyond what would be communication about the children" and that it could not "reasonably find that [the texts] are about matters about the children"—do not bear on Mr. Curtis's knowledge that his conduct was proscribed. *Supra* at 13.

[7] Mr. Curtis concedes in his brief that he "did intend to send the text messages to Johnson," which in the trial court's view constituted willfulness. He plainly does

of the trial court and the parties on this point, the requirement of a "wrongful state of mind" is clear. *Davis*, 834 A.2d at 866; *see also In re Moore*, No. 18-CM-1144, 2022 WL 710673, at *2 (D.C. Mar. 10, 2022) (stating that the term "willfully" generally "requires that the government show that the defendant acted with 'knowledge that the conduct is unlawful.'"); *Williams*, 51 A.3d at 1280 (stating that it "was not a correct statement of the law" for the trial court to instruct that "willfully does not mean that he knew he was breaking the law"). Counsel's inartful presentation of the willfulness aspect of the sufficiency claim does not amount to a strategic decision to forfeit the challenge under the correct standard and should not, in these circumstances, dictate the result of this appeal.[8]

---

not mean to concede, however, that he acted willfully as we have defined that term in *Davis*, *Moore*, and *Williams*.

[8] Contrary to the majority's suggestion, my concern is not about circumstantial versus "direct[]" proof—mens rea is of course often proven circumstantially. Here, though, given the ambiguity of both the CPO's language and the text messages, there is insufficient circumstantial evidence to prove willfulness beyond a reasonable doubt, and the trial court appeared to sidestep the element of willfulness altogether by finding it sufficient that Mr. Curtis "didn't accidentally send" the text messages to Ms. Johnson, but sent them "on purpose." Nor is my concern with some issue other than the one raised by Mr. Curtis—"whether Mr. Curtis's texts violated the CPO." An essential element of this crime—"violat[ing] the CPO"—is willfulness. The two are not separate issues; they are the same. Mr. Curtis preserved it in the trial court and the lack of a more artful and explicit articulation of it on appeal is partly a function of the parties' and trial court's own confusion regarding the law. Under these circumstances, it is appropriate to reach this important issue.

Finally, we should address the sufficiency of the evidence of willfulness—an essential element of the offense—because otherwise we will affirm this conviction without considering an imperfectly raised but potentially meritorious sufficiency claim that might establish that Mr. Curtis stands convicted of conduct that does not constitute a crime. *Cf. Alfaro v. United States*, 859 A.2d 149, 157 n.11 (D.C. 2004) (addressing the definition of the term "maltreatment" despite the government not having raised the question and noting that "the court is obviously obliged to construe" a term that appears in the statute and that "this obligation does not depend on the position taken by any party"); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (stating that "not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research.").

For the foregoing reasons, I respectfully dissent.