### In re Maurice JONES, Appellant.

### No. 01–FM–1462.

District of Columbia Court of Appeals.

Argued March 22, 2006.

Decided May 11, 2006.

Sandra K. Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Patrick F. Linehan, with whom Sandra F. Palmer, Washington, DC, and Laurie S. Kohn, pro bono counsel, Georgetown University Law Center Domestic Violence

Clinic, were on the brief, for appellee Wanda Clark.

Before REID and FISHER, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This is an appeal from an adjudication of criminal contempt for violation of a civil protection order (CPO). Because neither the terms of the CPO nor the trial court gave sufficient notice to appellant, Maurice Jones, about how to conduct himself in the courtroom, where literal compliance with the CPO was impossible, we must reverse and remand for entry of a judgment of acquittal.

## I.

In February 2001, appellee Wanda Clark filed a petition for a CPO in the Superior Court, alleging that Jones, the father of one of her children, had committed acts of violence against her in the preceding five years. The following month, the parties came to court where Jones, appearing *pro se,* agreed to the terms of a CPO without any admission of guilt.

The first provision of the CPO prohibited Jones from "assault[ing], threaten[ing], harass[ing], or physically abus[ing] Petitioner or her children in any manner . . . ." The second provision—the "stay away provision"—mandated that Jones must "stay at least 100 feet away from Petitioner's person, home, workplace, vehicle, other: [names of the three children]." Finally, the "no contact provision" prohibited Jones from contacting Clark "in any manner, including but not limited to: by telephone; in writing; in any other manner, either directly or indirectly through a third party . . . ." On at least three occasions the court asked Jones whether he understood the ramifications and consequences of entering the CPO, and each time he replied that he did.

Additionally, just before entering the CPO, the trial court explained its provisions to Jones:

Now, under the order, you may not assault, threaten, harass or physically abuse the Petitioner or her children in any way. You have to stay at least 100 feet from her, her home, her work place, her car and from [the children], and . . . you may not contact Petitioner in any fashion, not by telephone, in writing or indirectly through another individual.

Jones asked the court whether Clark would be able to "make up violations" against him, to which the court replied that she would not. The trial court then asked Jones whether the order was satisfactory to him. He replied that it was. The court entered the CPO and, addressing Clark, her two law student counsel, and Jones, said: "Please step forward for your copy of the order. And then if you'll remain in the courtroom, you can talk with Mr. Johnson," an Assistant Attorney General, about matters of paternity and child support. All four parties came forward.

Immediately after the parties left the well of the courtroom, one of Clark's counsel returned to the bench with the following allegation: "My client has just told me that the respondent just walked by her and said to her that she should 'watch it.' I'm just very concerned about the fact that a threat has just been made in the immediate aftermath of the Court issuing a CPO . . . ." Through counsel, Clark filed a Motion to Adjudicate Criminal Contempt and served it on Jones.

The following month, trial was conducted pursuant to Super. Ct.Crim. R. 42(b) (Disposition upon notice and hearing) before the same judge to determine whether Jones's actions amounted to criminal con-

tempt. Clark testified that, as she left the well, Jones frowned and told her to "watch it." Clark interpreted the words "as a threat" because of his history of assaulting her.

Next, Toki Rehder, a law student who had been present at the CPO hearing, testified on Clark's behalf. Rehder testified that during the CPO hearing Jones had "seemed very anxious" and "tensed." As Jones left the well, she heard him say " 'watch out,' under his breath." She also interpreted the words as a threat to Clark, because of "his demeanor during the CPO hearing" and because Rehder "didn't see who else it could be directed against."

For the defense, Peter Maignan, a lawyer who had been in the courtroom during the CPO hearing, was Jones's only witness. According to Maignan, although Jones did say "whoa" or "watch out" to Clark, it was not in a threatening manner. Rather, as Maignan perceived the situation, Clark had turned abruptly into the first row of seats in front of the well of the courtroom where her attorney was seated, and "it appeared that [Jones] was simply trying to slow down and avoid running into the petitioner as she made that sharp right hand turn." Clark's counsel then called her to testify again, and she acknowledged that she had stopped suddenly and turned into the first row of seats, as Maignan had testified. She added that she had done so only after she heard Jones's words and decided to alert her attorney about what Jones had just said.

At the close of the evidence, the trial court convicted Jones of one count of criminal contempt based solely on violating the CPO's no contact provision. D.C.Code § 16–1005(f) (2001) ("Violation of any temporary or permanent order under this subchapter ... shall be punishable as contempt"). The court stated that appellant had been charged "with making a statement to Ms. Clark, i.e., making contact with Ms. Clark, and *that's the only thing the court found to be in contempt.*" (Emphasis added.) But the stay away provision was not irrelevant:

> The 100 foot point is that he failed to keep a distance; he put himself in harm's way purposely to get close to Ms. Clark, ... reflecting a willful act that placed him in a position to speak with her.... [I]n the charging Motion, it doesn't say: "violated the 100 foot rule"; it says: "He spoke to her." So, that may not be as clear as I might say it, but the point is, the violating 100 feet, coming right up behind her, was part and parcel of showing a wrongful state of mind, that he intended to try to get close to her and be within her proximity. The statement: "Watch out," was willful. It was not by mistake or accident, and it was in willful disregard of the Court's order to have absolutely no contact with her....

The court sentenced Jones to 180 days in prison, suspended except for forty-five days to be spent on work release, followed by two years of supervised probation. His motion for judgment of acquittal was denied, and he filed a timely appeal.

## II.

The trial court's factual findings that underlie a contempt conviction will stand "unless they are without evidentiary support or plainly wrong." *Ba v. United States,* 809 A.2d 1178, 1182 (D.C.2002) (citations and internal quotation marks omitted). But we review de novo the question whether the defendant's acts, as found by the trial court, constitute a CPO violation. *Fields v. United States,* 793 A.2d 1260, 1264 (D.C.2002). This court will uphold the trial court's ruling if the evidence proves beyond a reasonable doubt that the defendant engaged in (1) willful disobedi-

ence (2) of a CPO. *Davis. v. United States,* 834 A.2d 861, 866 (D.C.2003) ("The offense requires both a contemptuous act and a wrongful state of mind"); *Ba,* 809 A.2d at 1183 ("government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order").

■■■ Constitutional due process requires that notice to parties "must be of such nature as reasonably to convey the required information." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Contempt of a court order "may be established only if the order allegedly violated is specific and definite, or clear and unambiguous." *Federal Mktg. Co. v. Virginia Impression Prods. Co.,* 823 A.2d 513, 523 (D.C.2003) (citations and quotation marks omitted); *see United States v. Rapone,* 327 U.S.App. D.C. 338, 131· F.3d 188, 192 (1997) (to support conviction under 18 U.S.C. § 401(3), evidence must show beyond a reasonable doubt that defendant willfully violated a "clear and reasonably specific" order of the court). These rules apply with equal force to CPO infractions inside the courtroom or courthouse. *See, e.g., Jones v. Harkness,* 709 A.2d 722, 723–24 (D.C.1998); *Brooks v. United States,* 686 A.2d 214, 218 (D.C.1996).

Jones's action appears to be literally in violation of the CPO's plain language: he uttered words in court to Clark soon after the CPO had been entered, and the words were not inadvertently spoken. Jones contends, however, that there is insufficient evidence to find that he willfully violated the CPO; the *mens rea* element, he says, is unsatisfied. In refuting the alleged willfulness, he maintains that the CPO failed to afford him sufficient notice of the manner in which to comport himself upon leaving the well of the courtroom. We agree with that assertion.

Finding the testimony of both Rehder and Maignan to be credible, and thus finding itself unable to decide whether Jones's words, "watch it" or "watch out" amounted to a "threat" or an "apology of excuse me," the trial court said that it "could not conclude beyond a reasonable doubt" that Jones's utterance "was a threat." Thus, the court was unable to find that Jones's words, standing alone, were enough to prove beyond a reasonable doubt the required *mens rea*—the required willfulness—for violation of the no contact provision. The court concluded, however, that it "doesn't matter if the words were meant as a threat or not. He made contact with the Petitioner"; the meaning of "watch it" or "watch out" was "irrelevant" to Jones's guilt. The only necessary *mens rea,* the court indicated, was a willful "contact" irrespective of the content of words spoken.

If Jones's words were not in themselves a contemptuous contact, to what "contact" was the court referring? The court acknowledged that Jones had not been convicted of violating the stay away provision, see *supra* Part 1, and that given the courtroom's dimensions he could not "stay 100 feet" away from Clark. But the court said that, despite the impossibility of literal compliance with the stay away provision, "you can place as much distance between yourself and the person you're suppose[d] to stay 100 feet from" as possible. In the end, therefore, the trial court invoked an uncharged violation of the stay away provision as the means of proving a willful violation of the no contact provision.

[H]e willfully violated at minimum paragraphs two and three of the substantive portion that he stay 100 feet away from her. *And recognizing the impossibility that he could stay 100 feet, he nonetheless could stay beyond a foot.* And that he not contact her and that was a contact. So for that reason, the Court finds

that he is in contempt of court beyond a reasonable doubt. (Emphasis added.)

As we understand the court's reasoning, it found a willful violation of the no contact provision by relying not on Jones's words as a threat but on those words as a mere "contact" resulting from his uncharged violation of the CPO's stay away provision. "The 100 foot point is that he failed to keep a distance; he put himself in harm's way purposely to get close to Ms. Clark, ... reflecting a willful act that placed him in a position to speak with her." In short, according to the trial court, Jones should have known that he was violating the stay-away provision, and that in doing so he willfully made a verbal, if non-threatening "contact" in violation of the no contact provision.

 We do not question that evidence of a defendant's willful commission of a crime—even if not charged and prosecuted—can be admitted to prove the defendant's willful commission of some other crime. See, e.g., Johnson v. United States, 683 A.2d 1087, 1093 (D.C.1996) (en banc). Thus, we do not dispute the trial court's premise that a willful violation of the stay away provision, facilitating a "contact," could supply the willfulness necessary for finding a violation of the no contact provision that a defendant's words themselves might not supply. But if a willful violation of the no contact provision depends on a willful violation of the stay away provision, the defendant must be on notice that a failure to keep a particular distance away is itself a violation; otherwise, the stay away basis for the no contact violation will lack willfulness.

It is true, as appellee Clark urges, that violation of § 16–1005 requires only a finding that "the individual committed a volitional act that constitutes contempt." Smith v. United States, 677 A.2d 1022, 1030 (D.C.1996); see Ba, 809 A.2d at 1183.

But Clark fails to demonstrate how the terms of the CPO, as applied to the facts before us, put Jones on notice that his actions would constitute a violation of the CPO. As the court itself recognized, the courtroom measures less than 100 feet across; the court had both Jones and Clark, with Clark's two student counsel, approach the bench simultaneously to pick up the court's order; and the court instructed the parties to remain in the courtroom to communicate with one another about paternity and child support issues (contrary to the literal language of the no contact provision) through a third party, the Assistant Attorney General. In the face of such instructions in rapid succession, literally contradictory of the CPO, appellant Jones, who lacked assistance of counsel, reasonably left the well immediately after Clark did. But even if he had received the benefit of legal counsel, it is far from clear that his attorney would have understood that Jones was, in the words of the trial court, "required to ... wait or pause to make sure [Clark] was clear of his presence."

Clark's reliance on the cases she cites is misplaced, because in each of those instances the inference of wilfulness was obvious, based on the appellant's actions themselves. See In re Dixon, 853 A.2d 708 (D.C.2004) (CPO barred any contact with appellee, yet appellant telephoned her sixteen times during a ten-day period); Jones, 709 A.2d at 723 ("appellant initiated contact with Ms. Harkness in violation of the CPO on eight separate occasions, in ways such as blocking her path with his car at a Metro station, throwing rocks at her bedroom window, approaching her in the children's schoolyard, going to the building where she works, and following her to the restroom while in the courthouse awaiting a hearing on the contempt matter"); Baker v. United States, 891 A.2d

208 (D.C.2006) (appellant embarked on "campaign of letter-writing" in violation of no contact order); *Ba,* 809 A.2d at 1178 (appellant accosted appellee late at night as she attempted to enter her house, in violation of no contact order). Here, on the other hand, the trial court explicitly noted that the case was a close one because the words themselves were not found to be a threat. Jones's actions—which witnesses interpreted in two very different ways—stand in marked contrast to the outright and blatant actions taken by appellants in the above-cited cases.

"To sustain a conviction on these facts, we would have to reach out to find justification for doing so. This is not our task, especially in a criminal case." *Vaas v. United States,* 852 A.2d 44, 48 (D.C.2004) (Schwelb, J., concurring). "[A] defendant cannot be convicted of criminal contempt where he or she is not put on notice of the specific conditions of the stay away order." *Vaas,* 852 A.2d at 46; *see Federal Mktg. Co.,* 823 A.2d at 523 (quoting *AccuSoft Corp. v. Palo,* 237 F.3d 31, 47 (1st Cir. 2001)) ("Courts are to construe ambiguities and omissions in consent decrees as redounding to the benefit of the person charged with contempt."). Here, Jones lacked notice as to what was expected of him in the courtroom. His conviction, therefore, cannot stand. *See Davis,* 834 A.2d at 867–68; *Brooks,* 686 A.2d at 218; *Smith,* 677 A.2d at 1031–32.[1]

*Reversed and remanded.*

---

1. Because literal compliance with a court order should not be impossible, "we strongly suggest that in future orders trial courts endeavor to set more defined parameters" with regard to how parties subject to CPO provisions must act while still in the courtroom. *Vaas,* 852 A.2d at 48. Here, for example, after explaining the terms of the CPO, the trial court could have added, "While in this courtroom, you are to remain as far away as practicable from petitioner. You may speak with the Assistant Attorney General about support and paternity matters, but not to petitioner or to her attorney."