Charles R. PAYNE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 05–CF–475, 05–CF–476.

District of Columbia Court of Appeals.

Argued June 5, 2007.
Decided Aug. 2, 2007.

Monoranjan Bezboruah for appellant.

John Interrante, Assistant United States Attorney, for appellee. Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, David B. Goodhand, Jonathan Haray, and Youli Lee, Assistant Unit-

ed States Attorneys, were on the brief, for appellee.

Before FARRELL and THOMPSON, Associate Judges, and TERRY, Senior Judge.

THOMPSON, Associate Judge:

A jury found appellant Charles R. Payne guilty of aggravated assault while armed (AAWA), *see* D.C.Code §§ 22–404.01 and 22–4502; possession of a prohibited weapon (PPW), *see* D.C.Code § 22–4514(b); one count of threats to do bodily harm, *see* D.C.Code § 22–1810; and one count of criminal contempt, *see* D.C.Code § 11–944(a). Payne argues that the evidence was not sufficient to convict him of aggravated assault or contempt. He also contends that the trial judge improperly refused to give certain jury instructions that the defense proposed and gave erroneous instructions on self-defense and reasonable doubt. Finally, in what we regard as his most substantial challenge, he claims that one of the jurors was coerced into finding him guilty. We reject each of these challenges, and therefore affirm.

## I. Background

The evidence at trial, viewed in the light most favorable to the government, *see Curry v. United States*, 520 A.2d 255, 263 (D.C.1987), was as follows. In June of 2003, the complaining witness, Phillip Alston, lived at 54 Rhode Island Avenue, N.E. Payne lived a few houses down the street at 46 Rhode Island Avenue with Alston's sister. On June 25, 2003, Alston went to 46 Rhode Island Avenue to visit with his sister. As he approached, he saw Payne working in the garden.

There was a verbal confrontation between Alston and Payne, during which Payne cursed at Alston and pushed him on the chest. The men fought. Alston began to walk away, but turned around as Payne charged at him while swinging. Payne was carrying gardening shears and stabbed Alston in his left shoulder and hand. As Alston retreated to his house, Payne followed him, stabbing him along the way and inflicting a total of sixteen wounds.

Payne was arrested for assault. During his initial court appearance on August 18, 2003, he was ordered to stay at least 100 yards away from Alston. On the afternoon of September 16, 2004, Alston was standing on a neighbor's porch at 18 Rhode Island Avenue, N.E., talking with friends. Alston saw Payne standing approximately three feet behind him. Payne remained there about fifteen to twenty minutes, glaring at Alston.

Payne testified that Alston, inebriated, confronted him in his garden, punched him in the face and "flattened" him. He acknowledged that he had scissors in his hand during the fight with Alston, but testified that the scissors remained "inverted" during the fight. Payne further testified that he thought the fight was over until Alston sprung at him again. At that point, Payne testified, he began to hit Alston with the scissors in the upper part of his body. Payne testified that his reactions during the fight were in response to his knowledge that Alston had martial arts training. As to the events of September 16, 2004, Payne testified that he was simply talking with two of his friends. Although he saw Alston, he "wasn't worried" because "so much time had elapsed" since the initial assault. Payne testified that he "didn't stare [Alston] down nor did [he] approach him" or try "to be hostile or give any hostile gestures whatsoever."

## II. Analysis

### A. Sufficiency of the Evidence

 To prove aggravated assault while armed beyond a reasonable doubt, the gov-

ernment had to show, *inter alia,* that Payne "caused serious bodily injury" to Alston. *Nixon v. United States,* 730 A.2d 145, 149 (D.C.1999). Payne argues that the government failed to meet that burden because the evidence did not show that Alston sustained a "serious" injury.

■ "Serious bodily injury" is "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Id.* (internal citation omitted). A reasonable juror may infer "extreme pain" from testimony about the nature of the victim's injuries. *Gathy v. United States,* 754 A.2d 912, 918 (D.C. 2000). Here, the evidence was that Alston was stabbed sixteen times with Payne's scissors and as a result bled from his back, hands, and shoulder. One of the stab wounds hit bone. By the time Alston arrived at the hospital, he could no longer move and was losing consciousness. *See id.* (upholding a finding of serious bodily injury where the victim stood "a substantial risk of unconsciousness"). Further, two bones in Alston's left hand were broken as a result of the assault, and Alston wore a cast for four months and missed eleven months of work, evidence of protracted loss or impairment of his arm. Alston also testified that he attended phys-

ical therapy for three months, developed arthritis ("so bad that it makes me not be able to work for maybe a week or two, you know, when I try to work"), and developed multiple scars. On this evidence, we have no trouble concluding that a reasonable jury could find that Alston suffered serious bodily injury from Payne's assaultive conduct.

■ Payne also argues that the evidence was not sufficient for the jury to find him guilty of criminal contempt.[1] To prove criminal contempt of court, the government must prove: "(1) conduct committed in the presence of the court that disrupts the orderly administration of justice; or (2) willful disobedience of a court order, committed outside the presence of the court." *Baker v. United States,* 891 A.2d 208, 215 (D.C.2006) (citations and emphasis omitted). Willful disobedience is found when one "intentionally violate[s]" a court order. *See Grant v. United States,* 734 A.2d 174, 177 (D.C.1999). Payne argues that he did not "willfully" disobey a court order as he did not intend to cause harm to Alston on September 16, 2004, and thus did not have the requisite "wrongful state of mind." However, Payne admits that he saw Alston, yet approached anyway, to speak with his friends. That Payne intentionally approached the location where Alston was standing was a sufficient basis for the jury to conclude that Payne willfully

---

1. Payne argues in addition that the stay-away order was invalid because literal compliance with the order was impossible. He asserts that because the house where he resided was just a few houses away from Alston's residence, if the stay-way order was valid, he unavoidably was in violation of the order whenever both men were at home. It is true that when a defendant has been given no guidance about how to conduct himself in a situation where literal compliance with a stay-away order is impossible, criminal contempt cannot be shown. *See In re Jones,* 898 A.2d 916, 922 (D.C.2006). However, the spe-

cific action supporting Payne's criminal contempt conviction did not occur when both men were at, or were actively en route to or from, their homes. Rather, it occurred when Payne moved in close proximity to Alston while Alston was standing on a neighbor's porch and remained there for a sustained period. On these facts, the reasoning in *Jones* about the impossibility of literal compliance did not preclude Payne's conviction of contempt; Payne cannot fairly say that he "lacked notice as to what was expected of him" in the situation. *Id.*

violated the court's order. That Payne may have meant no harm to Alston is of no consequence.

## B. Jury Instructions

Payne asked the court to give the jury the following instruction on the defense theory of the case:

> On June 25, 2003, Mr. Charles R. Payne was home tending his garden with a pair of scissors. Mr. Phillip Alston came to his yard and sucker punched Mr. Payne in his eye, and a fight broke out and spilled over to the street. Mr. Payne finally used the pair of scissors he had in his hand against Mr. Alston in self-defense. Mr. Payne did not want to cause serious bodily injury to Mr. Alston, thus, he tried to use the scissors to poke Mr. Payne only on the arm, and in the hand area to prevent Mr. Alston from doing him (Mr. Payne) grievous bodily harm. He did not knowingly and purposely cause any serious bodily injury on Mr. Alston. Mr. Payne possessed the scissors to tend to his garden, and he used it only for self-defense. He used the scissors to do what he thought was necessary to defend himself against a much stronger and what he thought a deadly and belligerent person high on alcohol etc. Mr. Payne did not threaten Mr. Phillip Alston on that June 25, 2003 night.

With respect to the contempt charge, Payne sought this instruction:

> Defendant Charles Payne did not approach or stare at Mr. Phillip Alston on September 16, 2004. He happened to be in the area of 18th Rhode Island Avenue, Northeast, and stopped to talk with his friends on the street. Mr. Payne did not engage in any willful attempt to show disrespect to the court. He did not commit any contemptuous act, nor did he have a wrongful state of mind.

The court declined to give the requested instructions, reasoning that they were "little mini-closing argument[s]" and observing that they were "long and fact bound" and were not valid defense theories.

■■■■ "As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Adams v. United States*, 558 A.2d 348, 349 (D.C.1989) (citation and quotation omitted); *see also Simms v. United States*, 867 A.2d 200, 204 (D.C.2005) (noting the defense must be "fairly raised by the evidence" (internal citation and quotation omitted)). However, a defendant is "not entitled to an instruction that does no more than rehearse or summarize the defense evidence, because this would give special emphasis to the defendant's testimony." *Durham v. United States*, 743 A.2d 196, 200 n. 5 (D.C. 1999) (citing *Montgomery v. United States*, 384 A.2d 655, 660 (D.C.1978)).

■■■■ We agree with the trial court that Payne's proposed instruction on self-defense was a summary of the defendant's testimony rather than a statement of legal principles. The trial judge rejected the proposed instruction, but acknowledged Payne's self-defense theory and gave a self-defense instruction very similar to the standard Red Book instruction.[2] We dis-

---

**2.** The trial judge, the Honorable Susan Winfield, gave the following self-defense instruction:

> The defendant is not required to prove that he acted in self-defense. If there is evidence of self-defense present, the govern-

ment has to prove that the defendant did not act in self-defense and they have to prove that beyond a reasonable doubt.

If the government fails to prove beyond a reasonable doubt that the defendant did not

cern no error or abuse of discretion in the court's approach. *Cf. Holt v. United States,* 675 A.2d 474, 483–84 (D.C.1996) (holding defendant's theory that he did not assault a police officer because he stopped when he found out the victim was an officer was adequately conveyed by the standard jury instruction for assault on a police officer).

▮ The trial judge also gave a standard instruction on contempt, *see* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.99O (4th ed.2005), that correctly noted that to find Payne guilty, the jury must find that he "willfully disobeyed" the court's order. As the standard instruction incorporated Payne's proposed instruction to the effect that he did not engage in a "willful show of disrespect to the court" and did not have "a wrongful state of mind," we discern no error in the court's instruction. A trial court "need not give the instruction in the precise language that is requested." *Campos v. United States,* 617 A.2d 185, 187 (D.C.1992). *See also Durham,* 743 A.2d at 200 n. 5 (denying guilt cannot be recognized as a valid defense "theory" as to which a defendant is entitled to an instruction (citing *Laughlin v. United States,* 154 U.S.App. D.C. 196, 206–07, 474 F.2d 444, 454–55 (1972))).

We also note that the trial court allowed Payne to argue both of his proposed instructions as "theories" during the closing argument. Under these circumstances, we cannot say that the trial court erred in refusing the proffered defense instructions.

▮ Payne next argues that the jury instructions given by the trial judge on self-defense and reasonable doubt were incorrect statements of the law.[3] He largely relies on the following occurrence. During jury deliberations, Judge Winfield was not available to answer jury questions, and so the Honorable Lynn Leibovitz filled in. The jury sent out a note asking, "Procedurally, what occurs if we are unanimous on 1(a)[4] guilty but are not unanimous on whether self-defense is present? Please advise." Judge Leibovitz observed that the jury had "misapprehended the instruction on self-defense." She then re-instructed the jury, telling them that "[s]elf-defense is a complete defense to the charges of aggravated assault while armed or assault with a dangerous weapon while armed," and thereafter giving the standard Red Book self-defense instruction.

Contrary to Payne's argument, Judge Leibovitz's comment that the jury "misapprehended" the prior instruction on self-

act in self-defense, you have to find the defendant not guilty.

The standard jury instruction states:

The defendant is not required to prove that s/he acted in self-defense. Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If the government has failed to do so, you must find the defendant not guilty.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.12 (4th ed.2005).

**3.** We note that Payne's trial counsel objected to neither of these instructions. As a result, our review is for plain error. *See Headspeth v. United States,* 910 A.2d 311, 317–18 (D.C. 2006). "Under the plain error standard, the

error must be (1) obvious or readily apparent, and clear under current law; and (2) so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Jones v. United States,* 779 A.2d 357, 360 (D.C.2001) (citations and internal quotation marks omitted). "This court will reverse under the plain error standard only in exceptional circumstances where a miscarriage of justice would otherwise result." *Id.* (internal citation and quotation omitted).

**4.** "1 (a)" apparently refers to question 1(a) on the verdict form: "How do you find the defendant, Charles Payne, on the charge of Aggravated Assault of Phillip Alston While Armed with scissors?"

defense cannot be construed as a comment that the prior instruction was deficient. Rather, the clear intent of Judge Leibovitz's comment was that the jury had misheard, misunderstood, or was misapplying the instruction that it previously was given. As both sets of instructions on self-defense were legally correct, and as there is no evidence that the jury was confused after the re-instruction, we can find no error or prejudice that affected the fairness and integrity of trial.[5]

 As to the reasonable doubt instruction, Payne appears to focus on the language that we have italicized in the following instruction that the court gave (as all of the other language in the instruction tracks the standard instruction): [6]

Reasonable doubt is not an imaginary doubt. It is not a doubt based on guess work or speculation. It is a doubt based upon reason. The government never has to prove guilt beyond all doubt. *That's impossible. They do not have to prove guilty beyond a shadow of a doubt. There's no such thing.* They do not have to prove guilt to a mathematical certainty and they do not have to prove guilt to a scientific certainty. They have to prove guilt beyond a reasonable doubt.

We see no way in which this language conveyed a faulty legal principle, prejudiced Payne, or improperly bolstered the government's case. We have previously approved instructions that include the statement that "[t]he government is not required to prove guilt beyond all doubt." *See, e.g., Smith v. United States,* 709 A.2d 78, 82 (D.C.1998). This means that the government need not prove to a certainty that the defendant committed the crime charged. The same concept of certainty is conveyed by the phrase "beyond a shadow of a doubt." [7] *Cf. Bartlett v. Battaglia,* 453 F.3d 796, 798 (7th Cir.2006) (upholding denial of habeas petition in case where prosecutor described the reasonable doubt standard as "[n]ot beyond any doubt, not beyond a shadow of a doubt, not beyond all doubt"); *State v. Lewis,* 220 Conn. 602, 600 A.2d 1330 (1991) (approving a preliminary instruction describing reasonable doubt as not "mean[ing] proof beyond a shadow of a doubt").

### C. Juror Coercion

 We must describe at some length the background of Payne's juror-coercion argument. At 2:00 p.m. on Wednesday, February 16, 2005, the jury began its deliberations, recessing at 5:00 p.m. The next day, a note sent to Judge Leibovitz

---

**5.** Payne asserts that the court "did not emphasize the fact that self-defense was an affirmative defense and that when present, the burden of proving its absence beyond a reasonable doubt rests with the Government." The instructions that Judges Winfield and Leibovitz gave did not employ the terms "affirmative defense" and "burden." But we fail to see how the instructions in any way appeared to diminish the government's task of proving that Payne did not act in self-defense.

**6.** The standard instruction states in relevant part:

[I]t is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based on reason. The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.09 (4th ed.2005).

**7.** The term "beyond a shadow of a doubt" is defined as "categorical, certain." WILLIAM C. BURTON, LEGAL THESAURUS 573 (1980). Alternatively, "[i]f something's beyond a shadow of a doubt, then absolutely no doubts remain about it." Idiom Definition: Beyond a Shadow of a Doubt, http://www.usingenglish.com/reference/idioms/beyond + a + shadow + of + a + doubt.html (last visited July 20, 2007).

was intercepted by her courtroom clerk. The clerk determined that the note, which was from Juror No. 7, contained information that the presiding judge should not see, so the note was sent to another judge (the Honorable Henry Greene), to review. Judge Greene, agreeing that the note contained information Judge Leibovitz should not see, put the note under seal.[8]

At about the same time, Judge Leibovitz addressed a scheduling conflict raised by Juror No. 10. That juror was excused because he was scheduled to leave for a vacation. At that point, Judge Leibovitz dismissed the jury for the day with instructions to reconvene the next morning. On February 18, Judge Leibovitz began by announcing that an alternate juror would replace Juror No. 10. She then told the parties that she would seat the alternate juror and would instruct the jury to begin deliberations anew.[9] She called the jury back into the courtroom and instructed them as follows:

> Because Juror Number 10 has been excused, Juror Number 13 has kindly returned to join all of you and to become a part of the jury.
>
> I am required by law to instruct you as follows because one juror has been excused in the middle of deliberations and an alternate juror has returned to join you.

I am required to instruct you to put aside any and all deliberations that you have participated in up until now and to begin your deliberations anew, as if you had just heard my final instructions or Judge Winfield's final instructions and were beginning deliberations as a new jury. I instruct you that all prior deliberations are void, they are not controlling in these cases.

> I will have [the courtroom clerk] take the verdict form that you were given at the beginning of deliberations in this case and place it under seal. It will no longer have any effect. None of the decisions, if any, that you made during deliberations up until now are controlling and any of you may change your minds from any position you took before if you wish to.
>
> A new verdict form will be given to you at this point.
>
> All decisions made by you as a juror up until now are void and held for naught.
>
> Because of all of this, you must begin to discuss this case entirely as a new jury.
>
> Let me address some things that did happen yesterday.... There was a[ ] note that was sent out yesterday by one

8. The note, which was later unsealed, reads:
 Judge Winfield,
 I am writing to you to let you know that against my repeated request the foreman has refused to inform you of a deadlock.
 After careful consideration of your instructions, the law, the evidence presented and the other jurors' views, I have made my decision.
 I have been under *extreme* pressure by some of the other jurors. I do not believe the state has made a sufficient case to allay my very reasonable doubts. My decision is made.
 Juror # 7

9. Judge Leibovitz's actions with regard to using an alternate to replace an excused juror and instructing the newly empaneled jury to "begin its deliberations anew" were appropriate. See Super. Ct.Crim. R. 23(c)(3); see also *McCallum v. United States*, 808 A.2d 1242, 1244 (D.C.2002) (approving an instruction requiring the jury to "commence [deliberations] again as if the prior deliberations have never occurred," noting that "all prior deliberations are void and not controlling in th[is] case[ ]," and commanding the jury to "begin to discuss this case as if I just finished my jury instructions to you at the close of the evidence" as the panel is "a new deliberating jury").

or more of you that I never saw. And it was a note that [the courtroom clerk] intercepted and gave to a colleague of mine, another judge, to see it because he felt that there were things in it that I shouldn't see.

At this time, I have never seen the note, I don't know who wrote it or who signed it or who sent it, and I don't know what it said. And I am going to make absolutely no effort to find out what it said.

I once again will tell you that any notes and communications you do wish to send out from here on out are up to you.

I will remind you of Judge Winfield's instruction to you that under no circumstances is the jury to disclose to me how the jury is divided on the questions of guilt or innocence before you have reached a unanimous verdict on any charge. And so do not communicate to me in any way, whether the jury is split five to seven, six to six or in any other fashion, whether for conviction or acquittal, and that is very important.

At that point, Judge Leibovitz excused the jurors to begin their deliberations.

Almost immediately, Juror No. 7 sent another note. It read:

We as a jury had been deadlocked since Wednesday [the first day of deliberations]. I am beat down. I have withstood being yelled, called names, insulted, laughed at.

On the other hand, I've been told on the side that I'm admired and suggested to by another to write a note to you.

I am physically and emotionally drained. Bringing in another juror is not going to solve the problem of hostility. I have a sick child and myself am not entirely well. If I cannot talk to you, can I see another judge?

Learning of this second note, Payne's trial counsel requested a mistrial.

Conferring with defense and government counsel, Judge Leibovitz correctly identified three issues raised in the second note: "The first is we were deadlocked before. And the second is I don't like how they're treating me, and the third is that I have a sick child and I myself am not feeling entirely well and can I talk to you." She then proposed the following response:

I should address the question about the sick child certainly and her own illness to the extent that it exist[s] and putting aside other issues, explore that and make sure that she can continue to deliberate . . . .

Secondly, with respect to deadlocked, I propose not to raise that at all with juror No. 7, but to say to the jury, as a group, there is a note from one of you discussing the fact that the jury may have been at an impasse from previous deliberations.

Because those deliberations are in nullity, I will not address that with you now and I consider any deadlock that may have existed before to have gone away . . . .

Now with respect to they, they're not treating me nicely, here is my proposal. Since the jury is coming back out as a whole anyway, I've looked at Judge Winfield's instructions, she does not give an instruction on the attitude and conduct of jurors. I usually do.

And what I propose to do is say to the group that I want to just say to them what I say to every jury I instruct, which is that the attitude and conduct of jurors during deliberations is a matter of importance.

That jury deliberations I know involved serious issues and the views that any of them express are serious and to be taken seriously.

I wanted to suggest to them, however, that how they express their views is also very important and that it should be done with candor and in a thoughtful and courteous manner and that expression in a civil manner will aid ultimately the work that they do.

Several times, Judge Leibovitz asked government and defense counsel whether they had any objections to her proposals, and neither counsel objected. Payne's counsel withdrew his motion for a mistrial.

Judge Leibovitz then brought Juror No. 7 into the courtroom alone. Juror No. 7 informed the court that she had taken care of the situation with her sick child and that there were no health problems that would prevent her from continuing deliberations. Judge Leibovitz then reminded Juror No. 7 that, with respect to the deadlock, the deliberations to date were a "nullity," but told her that if she had any further issues, she should bring those to the judge's attention in an additional note.

After Juror No. 7 returned to the jury room, the entire jury was once again brought before the court. Judge Leibovitz instructed them as follows:

I received a note from a juror this morning immediately after I instructed you but before deliberations began.

And the note suggests that in the previous deliberations the jury may have been at an impasse.

I instruct you that any impasse that the jury may have been at in prior deliberations is a nullity. It's gone away.

And the reason for that is that I'd instructed you this morning that you were to begin your deliberations anew.

And I will reiterate that the note that was sent to me yesterday is something that I have never read and could not begin to tell you what the contents are. I don't know what it says.

But with respect to any impasse that may have existed before now, it isn't relevant and you are to proceed today as if you are a new jury beginning immediately after my instructions to you this morning.

The other concern raised in the note regards interactions among jurors in the jury room and the manner in which you speak to one another. . . .

The attitude and conduct of jurors in their deliberations is a matter of considerable importance. Jury deliberations I know involve serious issues and serious views expressed by all members of the jury. The view[s] you each express are to be taken seriously.

I encourage each of you to express your view in deliberations candidly but always in a thoughtful and courteous manner with a view to civility to one another.

The value of your service to the court lies not in the opinions that any of you may hold in the jury room but rather in the verdict that you return at the conclusion of your deliberations.

And so with that, I encourage you to interact with one another, despite how serious these issues are and how strongly held you may feel your views to be, always in a courteous and civil manner.

With those instructions, Judge Leibovitz returned the jurors to their deliberations. The jurors deliberated one hour that day (a Friday), and, following a three-day weekend, returned to their deliberations on Tuesday morning at 9:45 a.m. They deliberated for an additional one hour and twenty minutes and returned their guilty verdict at 11:05 a.m. The jury was polled and Juror No. 7 responded affirmatively when asked if she agreed with the verdict stated by the foreperson.

■ "Where it is alleged that a jury verdict has been coerced, our cases demonstrate that two inquiries should be made." *Harris v. United States*, 622 A.2d 697, 701 (D.C.1993). "The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential." *Id.* "Then the two factors should be viewed together to assess the possibility of actual coercion on any juror or jurors." *Id.* at 701–02. "[W]e conduct our review of a claim of juror coercion from 'the perspective of the jurors.'" *Green v. United States*, 740 A.2d 21, 26 (D.C.1999) (quoting *Benlamine v. United States*, 692 A.2d 1359, 1363 (D.C.1997)).[10]

■ We enunciated several factors in *Harris* that guide us in the first inquiry, *i.e.*, as assessment of the coercive potential of the situation. The factors include, but are not limited to:

> the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

622 A.2d at 705. *Harris* instructs that we also must consider the actions of the trial court when determining whether a jury or juror was coerced. *See id.* at 701. In engaging in this task, we must ask several questions:

> Did the judge make affirmative efforts to dispel any coercive potential? Did the judge take a middle course and act (or refrain from acting) in a reasonable and neutral way? Did the judge perhaps compound the problem by actions effectively adding to juror pressure? Did the judge independently create a situation of coercive potential?

*Id.* at 705.

In this case, the inquiry into "isolation" reveals something of a mixed bag, so to speak, but on balance points to a conclusion that there was no isolation that amounted to coercion. Juror No. 7's note regarding the first set of deliberations suggests that her degree of isolation from her fellow jurors was initially high: she reported being "under *extreme* pressure," "beat down," and having been "yelled [at], called names, insulted, laughed at." On the other hand, at the time Juror No. 7 wrote her note (Thursday, February 17), "the jury had deliberated only a short time ... [t]hus, the inherent coercive potential of the situation was not great." *Harris*, 622 A.2d at 704. Moreover, the deliberations out of which Juror No. 7's initial experience arose were a nullity. *See, supra*, note 9. While her second note referred to "hostility," that note was written before deliberations commenced anew with the alternate juror, so that it could reveal nothing about whether any isolation continued during the new deliberations. And, the second note suggests that Juror No. 7 was receiving support from one or more of her fellow jurors: she was "told on the side that [she was] admired." After Judge

---

**10.** As no objection was made to either Judge Leibovitz's handling of Juror No. 7 or to sending the jury back into the room to deliberate, we review her decision to do so for plain error. *See Headspeth, supra* note 3, 910 A.2d at 320–21.

Leibovitz subsequently spoke with Juror No. 7 personally and informed her that, should she have any more issues, she could write another note during the second set of deliberations, Juror No. 7 wrote no further notes.[11] There also was no isolation of Juror No. 7 by Judge Leibovitz, as the judge did not identify Juror No. 7 to the other jurors as having raised the issue of lack of civility in the jury room.

As to the other *Harris* factors: the identity of the dissenting juror was never stated in open court. Judge Leibovitz knew that Juror No. 7 was a dissenting juror, but she did not know whether Juror No. 7 was the *sole* dissenter. No numerical division of the jury was ever revealed, even in the sealed note, and the second note can be read to suggest otherwise (as it indicates that Juror No. 7 was told by at least one other member of the jury that she was "admired"). The reconstituted jury was instructed to throw out any previous deliberations and to begin deliberating anew. Because juries are "presumed to follow instructions" unless the record indicates otherwise, *see Swanson v. United States,* 602 A.2d 1102, 1107 (D.C.1992) (internal citation and quotation omitted), we can assume that the jurors did not feel "bound" by their previous votes.[12] No deadlock was announced, and no anti-deadlock instruction was given.

Not only were Judge Leibovitz's actions *not* coercive, but also, we believe, her ac-

---

11. We cannot know whether Juror No. 7 was isolated during the second set of deliberations. However, we note that this juror appeared to have no hesitation in coming to the judge with problems she was having. It is notable that she did not do so a third time after the jury was reconstituted and instructed on civility. *Cf. United States v. Kopituk,* 690 F.2d 1289, 1310 (11th Cir.1982) (agreeing that there was no evidence of coercion of alternate juror by original jury members where deliberations continued for an extended period of time after the jury was instructed to begin deliberations anew).

At oral argument, Payne's counsel suggested that Juror No. 7 was denied the opportunity to write a note to the judge. We assume this suggestion is in reference to the conversation the juror had with the judge in which each of her three concerns was addressed. At the end of that conversation, the following exchange occurred:

COURT: I'm gonna [sic] bring in the rest of the jury and instruct them and respond to the note that had been sent out [concerning self defense] including addressing the civility issue that you raised.

If there are other issues you want to raise anew, given that deliberations had began again this morning, please do so—

JUROR: Can I do that before you bring anyone in? I mean, am I allowed to give you one more note and—

COURT: Ma'am, I'm gonna bring everybody in and you can write a note after that to Mr. Segar [the courtroom clerk] and we will address it either today or Tuesday morning. All right?

So I'm gonna ask you to return to the jury room. I will bring everybody out.

JUROR: Yes.

Thus, Juror No. 7 asked to write another note immediately, before the court had had an opportunity to instruct the full reconstituted jury on civility. At most, the judge's response was an instruction to Juror No. 7 to wait before sending another note. The judge's response cannot fairly be characterized as denying Juror No. 7 the opportunity to write to the judge again. Also, as already noted, Judge Leibovitz specifically told Juror No. 7 that if she had any further issues, she should bring those to the judge's attention in an additional note. We therefore reject any suggestion that Juror No. 7 was coerced into silence.

12. *Cf. United States v. McFarland,* 34 F.3d 1508, 1514 (9th Cir.1994) (finding plain error on the ground that then-Fed. R.Crim. P. 23(c) required the trial court to discharge all alternates who had not been seated as jurors by the time deliberations began, but concluding that "where the district court has substituted an alternate after deliberations have begun but has instructed the reconstituted jury to begin their deliberations anew, there is no inherent prejudice").

tions were well designed to relieve or dissipate any coercion that may have attended the first set of deliberations. Judge Leibovitz actively shielded herself from any attempt by the jury to inform her as to the jury split during deliberations. She heeded her courtroom clerk's advice that the first jury note contained information she should not see, and she asked a colleague to review the note and make any relevant findings. She made it clear to the jury that she had "never seen the note, [doesn't] know who wrote it or who signed it or who sent it, and [doesn't] know what it said." Thus, this case is not like *Smith v. United States*, 542 A.2d 823, 825 (D.C. 1988), where "although the judge took great pains not to learn of the [jury's numerical] division, he did not inform the jury of this fact," and where "[t]he jury thus reasonably felt the judge knew of its lopsided split for conviction," so that " 'any pressure by the judge to reach a verdict ... [would] be understood by all jurors to be directed at the minority.' " *Harris*, 622 A.2d at 704. Judge Leibovitz's actions in requiring the reconstituted jury to commence deliberations anew could not fairly be interpreted as a direction to a minority of the previously constituted jury to "come around" to the position of the majority.

At no time did Judge Leibovitz announce to the full jury panel that Juror No. 7 was a dissenter.[13] Furthermore, upon discovering the hostility that had been occurring in the deliberations, Judge Leibovitz took immediate corrective action by giving a "civility instruction." No in-

structions that the judge gave indicated that any juror should conform to the majority vote. To the contrary, her instruction charged that "[n]one of the decisions, if any, that you made during deliberations up until now are controlling and any of you *may change your minds from any position you took before if you wish to* " (emphasis added). This "may" and "if you wish" language conveyed that a juror could continue to hold the same opinions after the new deliberations began as they held before those new deliberations began.

Considering all these factors from the juror's point of view, we see no coercion in the surrounding circumstances. Here, as in *Harris*, the trial judge "acted with sensitivity and skill to alleviate coercion." 622 A.2d at 707. And, as there was no further indication that the jury was acting with hostility toward Juror No. 7, we cannot assume that she was coerced into changing her vote. *See Smith*, 542 A.2d at 824 ("Coercion of a jury verdict does not mean simple pressure to agree; such pressure is a natural function of sending twelve persons into a jury room to deliberate.").

For all the foregoing reasons, the convictions are

*Affirmed.*

---

13. That fact distinguishes this case from *Crowder v. United States*, 383 A.2d 336, 341–43 (D.C.1978) (reversing conviction due to the "inevitable increase in potential coerciveness" attendant to requiring the jury to retire for further deliberations when the lone dissenter was the last juror polled and the poll thus revealed the precise numerical split (eleven to one) and the identity of the dissenter). Moreover, Judge Leibovitz instructed

the jury that in future notes, they should not tell her "how the jury is divided on the questions of guilt or innocence" or "whether the jury is split five to seven, six to six or in any other fashion, whether for conviction or acquittal...." *Cf. Artis v. United States*, 505 A.2d 52, 58 (D.C.1986) (holding the potential for coerciveness was minimal where juror was not isolated and numerical split was not revealed).