Julia SANDOVAL, Appellant,

v.

Jose E. MENDEZ, Appellee.

No. 85–1112.

District of Columbia Court of Appeals.

Submitted July 14, 1986.

Decided March 6, 1987.

---

Robert D. Dinerstein, Washington College of Law, Ann Wilcox-Staats, Student Atty., and Laura A. Foggan, Women's Legal Defense Fund, Washington, D.C., were on brief, for appellant.

Before PRYOR, Chief Judge, NEWMAN and FERREN, Associate Judges.

PER CURIAM:

Sandoval contends the trial court erroneously concluded as a matter of law that she was not entitled to a civil protection order since she did not have an "intimate relationship" with Jose Mendez within the meaning of D.C.Code § 16–1001(5)(B) (1986 Supp.). We affirm.

Sandoval lived in a common household with her boyfriend (Marquez) and Mendez and his girlfriend (Claros). Marquez and Claros are cousins. Sandoval, claiming all four of the members of the household were involved in violence, sought a civil protection order against the other three. She withdrew her request as to her boyfriend; Claros signed a consent order. The matter proceeded to a hearing as to Mendez. Sandoval presented her case, pro se. On the sparse record before us,[1] it appears that the trial court did not rule as a matter of law that an "intimate relationship" as a matter of law, must be a sexual one, as Sandoval contends. Rather, it appears that the trial court found as a fact that there was no showing of an "intimate relationship." On this record, we cannot say that such factual finding is "plainly wrong." D.C.Code § 17–305(a) (1981).[2]

*Affirmed.*

## APPENDIX

THE COURT: All right. Thank you. Have a seat. We will finish our preliminary matters and then we will hear the matter with Mr. Mendez because that is not a consent it appears all right? Thank you.

MS. BUCK: Thank you.

\* \* \* \* \* \*

THE DEPUTY CLERK: Returning to No. 10 in the matter of Julia Sandoval versus Jose Mendez, IF 500–85.

THE COURT: Senor Mendez.

THE DEPUTY CLERK: Parties give your name for the record.

MR. MENDEZ: Jose Mendez.

MR. LORD: Bernardo Lord, Your Honor.

MS. SANDOVAL: Julia Sandoval.

1. Given the basis of our disposition of this case, and the views expressed by our dissenting Brother, we attach as an Appendix hereto, the full transcript of the evidentiary hearing and ruling. For the convenience of the reader, we note that Ms. Buck was the interpreter and Ms. Thomas appears to be a representative of the Department of Human Services.

2. To the extent that portions of the transcript reflect "undiscernible", we note that the party on appeal contending the trial court erred has the obligation of presenting to us a sufficient record to establish error. *Cobb v. Standard Drug Company, Inc.,* 453 A.2d 110 (D.C.1982).

We further note that D.C.Code § 16–1005(c) makes the issuance of a civil protection order discretionary with the trial court. On this record, we can find no abuse of discretion. *See Johnson v. United States,* 398 A.2d 354 (D.C. 1979).

MS. BUCK: Anna Buck.

THE DEPUTY CLERK: Both parties raise your right hands.

[Thereupon, the parties were sworn by the Deputy Clerk.]

THE COURT: Siente se. Senor, que nombre, por favor.

Tell me what happened on May 2.

Un momento.

MS. SANDOVAL: [Through the Interpreter.] She was close to him and tried to hear him what he was talking.

Marita Claros and Jose Mendez, they come out and they get in both sides of the car.

THE COURT: Who is the boyfriend? Se novio nombre?

MS. SANDOVAL: [Through the Interpreter.] Jose Francisco Marques.

So she asked Marita Claros why she was angry because she was close to Francisco Marques.

She did not know he was her boyfriend.

She said she should be angry if I get close to your boyfriend when I get close to her boyfriend.

She don't remember how she answered her.

THE COURT: All right. Can we get past the talking.

MS. SANDOVAL: [Through the Interpreter.] She was saying—she was asking Mrs. Marita Claros was she angry with her because she get close to her cousin.

THE COURT: Um-hmm.

MS. SANDOVAL: [Through the Interpreter.] And she answered her, you having anything with him?

THE COURT: Um-hmm. And then what happened?

MS. SANDOVAL: [Through the Interpreter.]: So when she claimed that to her, she threw to her a can of baby milk.

THE COURT: Ms. Claros did, threw milk, a bottle? Is that what you're talking about?

MS. BUCK: A can.

THE COURT: A can of baby milk at her.

MS. SANDOVAL: [Through the Interpreter.] Okay. So when she saw herself with a lot of blood soo she gonna try to—

THE COURT: Just a minute, please, just a minute. You're going much too fast for me.

MS. SANDOVAL: [Through the Interpreter.] Okay. So when she saw all this blood on her hand, she tried to get Martha Claros and her boyfriend started beating her.

THE COURT: Whose boyfriend?

MS. BUCK: Martha Claros' boyfriend.

THE COURT: Is that Mr. Mendez? What did he do?

MS. SANDOVAL: [Response in Spanish].

THE COURT: No, I don't want you to tell me what happened. What did he do? Did he do something with his hands, with his foot? What did he do?

MS. SANDOVAL: [Response in Spanish].

THE COURT: And where was Ms. Claros at this time?

MS. SANDOVAL: [Through the Interpreter.] Beating her too. At the same time her boyfriend was beating her and her—okay, Mr. Marques beat her and then hit her in the mouth.

THE COURT: Mr. Mendez or Mr. Marques?

MS. SANDOVAL: [Through the Interpreter.] Mr. Marques was holding her in back.

THE COURT: That's your boyfriend was holding you in the back. Su novio.

MS. SANDOVAL: Yes, Your Honor.

[Through the Interpreter.] And Mr. Mendez was punching her in the mouth and in the head and Mrs. Claros was pulling her hair.

She said because she doesn't know any English, she would go to her brother's house to call the police.

She found the police in the street and she stopped them.

The police gave her a little paper to go court.

THE COURT: Is there any relationship between Ms. Sandoval and Mr. Mendez?

MS. SANDOVAL: [Through the Interpreter.] No, Your Honor.

THE COURT: Do they live in the same place?

MS. SANDOVAL: [Through the Interpreter.] No. They used to live together.

THE COURT: They used to live together where?

MS. SANDOVAL: [Through the Interpreter.] They used to live Julia Sandoval and her boyfriend whose—what is the name of su novio?

Jose Francisco Marques.

THE COURT: And Mr. Mendez.

MS. SANDOVAL: [Through the Interpreter.] And Mr. Mendez and Ms. Claros.

THE COURT: All used to live together.

MS. SANDOVAL: [Through the Interpreter.] They all used to live together when this occurred.

THE COURT: And was Mr. Mendez ever Ms. Sandoval's boyfriend?

MS. SANDOVAL: [Through the Interpreter.] Marques.

THE COURT: Si. Pero Senor Mendez.

MS. SANDOVAL: [Response in Spanish.]

THE COURT: Anything else you want to tell me?

MS. SANDOVAL: [Through the Interpreter.] No, that's all.

THE COURT: Step down, please.

MS. SANDOVAL: [Through the Interpreter.] (Indiscernible)....

THE COURT: Yes, I understand that.

MS. BUCK: Thank you.

THE COURT: Thank you. Ms. Thomas, would you approach the bench, please?

[Thereupon Ms. Thomas approached the bench and conferred with the Court, as follows:]

THE COURT: I don't think we have jurisdiction over this. The only one that we have is when she was (indiscernible), right?

MS. THOMAS: Right.

THE COURT: They are not willing to (indiscernible) relationship.

MS. THOMAS: I don't know. I think they (indiscernible). They had lived together in the past year.

THE COURT: Yes, but it requires (indiscernible), intimate relationship and I couldn't get one here, right? I mean, you don't know of any.

MS. THOMAS: Not at all.

THE COURT: I missed that interpreter's name. Do you know her name?

MS. THOMAS: Anna Buck.

THE COURT: All right. (Indiscernible)....

[Thereupon the proceedings had at the bench were concluded; Ms. Thomas returned to her seat; and the hearing resumed, as follows:]

THE COURT: In order for something—perhaps you would translate for your client's benefit while I'm talking and of course.

In order for something to qualify as a intrafamily offense, the people who lived together must have also have had an intimate relationship. In other words, not everybody who shares a house or even an apartment falls within the jurisdiction of the statute against intrafamily offenses.

That's not to say that you can beat up somebody just because you don't have an intimate relationship with them. What it is to say is that it is a criminal offense but not an offense for which this court has jurisdiction to issue a civil protection order.

I understand, Ms. Buck, that the petition form unfortunately doesn't stress that enough. But it does say it. If you notice it says, (1), the petitioner and respondent maintain or have maintained an intimate relationship, and (2), then there's something else such as the living together.

MS. BUCK: Right. You don't notice that it is one that says, now sharing or

having shared the same resident within the last year.

THE COURT: That's right, but that's two things. (1) the sentence above that is that they have maintained an intimate relationship and one of the other things. And while they shared a residence, they did not appear to have an intimate relationship. That being the case, I don't have jurisdiction to issue a civil protection order here.

As I said, that doesn't mean that anybody, Mr. Mendez, or anyone else, can beat up anybody and—but what it does mean is that Ms. Sandoval will have to go elsewhere to get her remedy. Did Ms. Sandoval understand? What about if we—

MS. SANDOVAL: [Through the Interpreter.] No.

MS. BUCK: I was thinking different. I was wrong then because I was thinking that having shared the residence together, Your Honor.

THE COURT: I understand but you see it required that there have been an intimate relationship. That's the first requirement no matter whether they shared an apartment or not.

MS. BUCK: Okay.

THE COURT: So the case against Mr. Mendez in this Court is dismissed for lack of jurisdiction.

If Ms. Mendez—I'm sorry—if Ms. Sandoval wants to pursue other remedies she can speak to the U.S. Attorney's Office which is right in this building.

MS. SANDOVAL: [In Spanish]

THE COURT: I'm sorry.

MS. SANDOVAL: Thank you.

[Thereupon the proceedings were concluded.]

FERREN, Associate Judge, dissenting:

There can be no doubt that the trial court dismissed this petition for a "civil protection order with respect to an intrafamily offense"[1] for lack of subject matter jurisdiction.[2] Specifically, the judge ruled that she did not "have jurisdiction to issue a civil protection order" because a statutory prerequisite for an "intrafamily offense" had not been met: although Ms. Sandoval and Mr. Mendez shared a "mutual residence," they did not—as the statute requires—have an "intimate relationship."[3] As I read the transcript, the judge construed "intimate relationship" to mean an amorous relationship. Of apparently critical significance, the judge asked, "[W]as Mr. Mendez ever Ms. Sandoval's boyfriend?" Upon discerning that Sandoval and Mendez were not lovers, the court ruled *as a matter of law* that no intrafamily offense could have taken place.

The majority, therefore, is plainly wrong in concluding the trial court merely "found as a fact there was no showing of an 'intimate relationship,'" *ante* at 1169, and then in premising affirmance on deference to the trial court's perception of the evidence pursuant to D.C.Code § 17–305(a) (1981). That analysis is faulty, more specifically, for three reasons: (1) it assumes,

1. D.C.Code § 16–1003(a) (1986 Supp.) provides:
 Upon referral by the United States attorney, or upon application of any person or agency for a civil protection order with respect to an intrafamily offense committed or threatened, the Corporation Counsel may file a petition for civil protection in the Family Division. In the alternative to referral to the Corporation Counsel, a complainant on his or her own initiative may file a petition for civil protection in the Family Division.

2. The majority's alternative holding in the second paragraph of its second footnote is therefore irrelevant. The trial court never purported to exercise discretion. In any event, a determination as to whether there is an "intimate relationship" (in contrast with the question whether

a civil protection order should issue) is not a matter committed to trial court discretion; that determination ultimately is correct, or not, as a matter of law.

3. D.C.Code § 16–1001(5) (1986 Supp.) provides:
 The term "intrafamily offense" means an act punishable as a criminal offense committed by an offender upon a person:
 (A) to whom the offender is related by blood, legal custody, marriage, having a child in common, or with whom the offender shares or has shared, within the last year, a mutual residence; and
 (B) with whom the offender maintains or maintained an intimate relationship rendering the application of this chapter appropriate.

without deciding, trial court jurisdiction (which the trial judge herself expressly eschewed and my colleagues do not even discuss); (2) it sustains the trial court's ruling on the merits (an exercise the trial judge never undertook) after incorrectly characterizing the issue as fact-finding, whereas the existence of an "intimate relationship" sufficient to permit a civil protection order is, ultimately, a question of law; and (3) whether the issue, fundamentally, is one of jurisdiction or the merits, the majority's analysis does not give a clue as to what an "intimate relationship" is for purposes of adjudicating the Sandoval-Mendez dispute.

Contrary to the majority's approach, this court is squarely presented with a question of law: whether persons who share "a mutual residence" but do not have an amorous relationship can ever be said to have an "intimate relationship" within the meaning of D.C.Code § 16–1001(5)(B), such that the trial court has jurisdiction to issue a civil protection order in the exercise of sound discretion. I believe the answer is yes. Because the trial court, as I read the record, concluded otherwise, we cannot affirm.

In the first place, the word "intimate," as commonly defined, is not limited to amorous or sexual connotations. WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1970) defines "intimate" as, for example, "marked by very close association, contact, or familiarity"; "marked by a warm friendship developing through long association"; "suggesting informal warmth or privacy." BLACK'S LAW DICTIONARY (5th ed. 1979), defines "intimate" as "close friendship or acquaintance, familiar, near, confidential." More significantly, the legislative history of § 16–1001(5)(B) supplies a broad definition of "intimate relationship" that clearly covers this case. According to the Report of the Committee on the Judiciary of the Council of the District of Columbia, Bill 4–195, Proceedings Regarding Intrafamily Offenses Amendment Act of 1982 (May 12, 1982) at 9:

> Consistent with the philosophy of domestic violence statutes around the country, the special civil protections of the intra-

family statute become available under the bill to persons with whom the offender "maintains or maintained an intimate relationship" rendering application of the intrafamily offenses statute appropriate —i.e. the offender and the complainant must have or have had bonds of a genuine familial *, *devoted, or homemaking nature;* the substance of the relationship, not its form, being the key. [Emphasis added.]

---

* This includes parentage.

Given the breadth of these definitions in contrast with the trial court's understanding—and especially given the legislative history's reference to distinct relationships of a "devoted" and a "homemaking" nature—I conclude that, on this record, Sandoval and Mendez appear to have had an intimate relationship. The trial court too narrowly construed its jurisdiction, and my colleagues in the majority too superficially sustain the court's ruling on an alternative ground that blatantly ignores the threshold, legal issue presented.

I would reverse and remand for further proceedings, including, at the outset, appointment of counsel for Mendez. Respectfully, therefore, I dissent.