Sisay SHEWAREGA, Appellant,

v.

Kidist YEGZAW, Appellee.

No. 06–CT–969.

District of Columbia Court of Appeals.

Submitted March 27, 2008.

Decided April 18, 2008.

David Carey Woll, Wheaton, MD, was on the brief, for appellant.

Appellee did not submit a brief.

Linda Singer, then Attorney General of the District of Columbia, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and Sidney R. Bixler, Assistant Attorney General, filed a brief on behalf of the District of Columbia as amicus curiae.

Before GLICKMAN and THOMPSON, Associate Judges, and TERRY, Senior Judge.

GLICKMAN, Associate Judge:

Sisay Shewarega appeals his conviction of criminal contempt for willfully disobeying a civil protection order (CPO) issued pursuant to the Intrafamily Offenses Act.[1] Appellant argues that his contempt conviction must be reversed because the CPO was void *ab initio* for lack of subject mat-

ter jurisdiction, and alternatively for insufficient proof that he violated the CPO. We reject appellant's jurisdictional argument. We conclude, though it is a close question, that there is sufficient evidence in the record to support appellant's contempt adjudication. However, because the trial court's determination rests on factual findings that are clearly erroneous, we must remand for the court to reconsider its verdict after an accurate assessment of the trial record.

**I.**

The statutory predicate for issuance of a CPO is a finding of good cause to believe that the respondent has committed or is threatening to commit an "intrafamily offense" within the meaning of D.C.Code § 16–1001(5).[2] At the time of the events at issue here, that statute defined an "intrafamily offense" as follows:

> The term "intrafamily offense" means an act punishable as a criminal offense committed by an offender upon a person:
>
> (A) to whom the offender is related by blood, legal custody, marriage, having a child in common, or with whom the offender shares or has shared a mutual residence; or
>
> (B) with whom the offender maintains or maintained a romantic relationship not necessarily including a sexual relationship. A person seeking a protection order under this subparagraph shall reside in the District of Columbia or the underlying intrafamily offense shall have occurred in the District of Columbia.[3]

In her petition for a CPO, appellee Kidist Yegzaw alleged that she and appellant

---

1. D.C.Code § 16–1001 *et seq.* (2001 & Supp. 2007).

2. *See* D.C.Code § 16–1005(c).

3. D.C.Code § 16–1001(5) was amended in respects not pertinent to our construction of the statute in this case by D.C. Law 16–306, § 206(a), 53 D.C.Reg. 8610 (effective Apr. 24, 2007).

shared the same residence—a boarding house owned and occupied by appellant, in which she rented a room—and that appellant had committed an intrafamily offense by assaulting and threatening her.

After holding a hearing, the trial court granted Ms. Yegzaw's petition. The CPO, issued on April 21, 2006, recites the court's findings of jurisdiction over the parties and subject matter, and of good cause to believe that appellant had committed an intrafamily offense. Appellant was ordered not to "assault, threaten, harass, or stalk Petitioner, or destroy Petitioner's property." Appellant was not barred from otherwise contacting or communicating with Ms. Yegzaw. The CPO, which appellant signed, warned that if he did not comply with its terms, he would be subject to prosecution for civil or criminal contempt.[4] Appellant did not appeal the entry of the CPO.

Less than three weeks later, Ms. Yegzaw moved the court to adjudicate appellant guilty of criminal contempt. She alleged that appellant had violated the CPO on May 8, 2006, by knocking forcefully on her bedroom door, yelling and screaming at her, and making threats to get her deported to her native country and to kill her.

Appellant moved to dismiss the contempt proceeding on the ground that the Superior Court lacked jurisdiction to issue the CPO. At the hearing on the motion, appellant testified, and Ms. Yegzaw agreed, that they never had a familial, romantic, or intimate personal relationship of any kind; their only relationship was one of landlord and tenant at the rooming house where they both resided. The CPO was void for want of jurisdiction, appellant argued, because the Intrafamily Offenses Act had not been and (as its title suggests) should not be construed to apply to such impersonal relationships. The trial court rejected this argument, and denied appellant's motion, in view of appellant's admission that the kitchen, living room, dining room, entrance, and hallways at the rooming house were common areas for all the residents, including Ms. Yegzaw and himself. The court found that appellant and Ms. Yegzaw therefore "shared a mutual residence" within the meaning of D.C.Code § 16–1001(5). That limited relationship was enough, the court ruled, to satisfy statutory prerequisites for an "intrafamily offense."

At trial, Ms. Yegzaw prosecuted her motion for contempt without the assistance of counsel. She did not testify; her only witness was her housemate, Shawaue Taffese. Ms. Taffese testified that on the night of May 8, 2006, appellant followed Ms. Yegzaw up to her room from the kitchen, where Ms. Yegzaw had brewed some tea. Appellant was shouting at Ms. Yegzaw, reviling her for her use of the kitchen. He then banged on her door and, Ms. Taffese recalled, he yelled "I'm going to make you deported.... I'm going to deport two of you, but especially her." Ms. Taffese did not testify to any other threats. On direct examination, she stated that appellant hit Ms. Yegzaw (which Ms. Yegzaw herself had not alleged). However, Ms. Taffese retracted that statement on cross-examination, saying "I didn't say that he hit her. He was going to hit her. He came to hit her.... He came forward, he banged the door and then he came forward to hit her," though he did not actually do so. Both Ms. Taffese and Ms. Yegzaw were frightened; they called the police, who responded but made no arrest.

4. D.C.Code § 16–1005(f) provides that violation of a civil protective order is punishable as contempt.

Appellant presented three witnesses in his defense. He and his girlfriend, Hewan Worku, testified that they were in his room on the night of May 8. At some point, Ms. Worku went to the kitchen for some water and called up to appellant to ask if he had meant to leave the downstairs lights on. Ms. Yegzaw and Ms. Taffese then came out of their rooms and started screaming and cursing at Ms. Worku, telling her that the lights were none of her business. Appellant emerged and escorted Ms. Worku back to his room without speaking to the other two women. When the police arrived, appellant and Ms. Worku told them what had happened, and the police left. This testimony was partially corroborated by the third defense witness, Saba Alemu, who also rented a room in appellant's house. Ms. Alemu testified that she was awakened on May 8 by the women's yelling and did not hear appellant's voice at all.

At the conclusion of the trial, the court reviewed the evidence before delivering its verdict. Observing that "the case comes down to who do you believe," the court "credit[ed] the testimony of Ms. Yegzaw and Ms. Taffese" that appellant "made threats. Threats to kill Ms. Yegzaw. Threats to have her deported." Accordingly, the court found, appellant violated the CPO "by making threatening and harassing statements" to Ms. Yegzaw.

## II.

Appellant's challenge to the court's jurisdiction rests on his claim that his relationship with Ms. Yegzaw fell outside the purview of the Intrafamily Offenses Act because it was not of a familial, romantic, or other intimate nature. This challenge must be rejected for two independent reasons.

First, appellant was not entitled to attack the validity of the CPO in the contempt proceeding on the grounds he asserted. Even if his relationship with Ms. Yegzaw could not have supported the issuance of a CPO under the Intrafamily Offenses Act, appellant still was obligated to obey the court order unless and until it was reversed or vacated, on pain of being found in contempt.[5] It is true that "[v]oidness of a court order is an absolute defense" to a contempt charge,[6] and that disobedience of a void order may not be punished as contempt.[7] But a court order is void "only if the court that entered it had no jurisdiction over the parties or the subject matter, or if the court's action was otherwise so arbitrary as to violate due process of law."[8] The CPO issued against appellant was not void in this narrow

---

5. *See, e.g., Baker v. United States,* 891 A.2d 208, 212 (D.C.2006) ("[E]ven assuming for the sake of argument that the trial court's no-contact order was invalid, Baker's conviction for contempt must be upheld for his failure to comply with that order.") (citations omitted); *In re Marshall,* 445 A.2d 5, 7 (D.C.1982) ("[A]ppellant had an obligation either to comply with the court order ... or to seek to have the order vacated."); *In re Evans,* 411 A.2d 984, 993 n. 10 (D.C.1980) ("As a general rule, '[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal.'") (quoting *United States v. United Mine Workers,* 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884 (1947)).

6. *Kammerman v. Kammerman,* 543 A.2d 794, 799 (D.C.1988).

7. *See In re Banks,* 306 A.2d 270, 273 (D.C. 1973) (stating that a void order "could be disobeyed with impunity").

8. *Kammerman,* 543 A.2d at 799 (internal citations omitted); *see also Marshall,* 445 A.2d at 7 ("The court had jurisdiction of the party and of the subject-matter. Hence, however defective or erroneous the proceedings, the judgment was not void, and could, at most, be voidable.") (quoting *Hunter v. United States,* 48 App. D.C. 19, 23 (1918)).

sense. The Superior Court unquestionably had subject matter jurisdiction over the petition for a CPO and personal jurisdiction over the parties, and appellant makes no claim that the court denied him due process.

■ In any event, appellant's claim that the Intrafamily Offenses Act does not apply to his non-intimate relationship with Ms. Yegzaw is mistaken. Formerly, D.C.Code § 16–1001(5) defined an intrafamily offense as a criminal offense committed by an offender upon a person:

>(A) to whom the offender is related by blood, legal custody, marriage, having a child in common, or with whom the offender shares or has shared a mutual residence; *and*

>(B) with whom the offender maintains or maintained an intimate relationship rendering the application of this chapter appropriate.[9]

By using the word "and" between subparagraphs (A) and (B), the former statute did require an "intimate relationship," in addition to one of the relationships listed in subparagraph (A), to establish an intrafamily offense, as this court stated in *McKnight*[10] and *Sandoval*.[11] But those cases, on which appellant relies, are outdated, because the statute was amended in 1995. Among other changes, the 1995 amendment replaced the word "and" connecting subparagraphs (A) and (B) of D.C.Code § 16–1001(5) with "or," so as to provide that any relationship listed in either subparagraph would suffice by itself.[12] Sharing a mutual residence need not coexist with any of the other relationships—kinship, legal custody, marriage, having a child in common, or a romantic relationship—on which an intrafamily offense may be predicated, for it is listed as an alternative to all of them. So far as the statute is concerned, the reason the parties shared a mutual residence is immaterial.

## III.

■ Conviction of criminal contempt for violating a CPO requires proof beyond a reasonable doubt that the defendant willfully disobeyed the court's order.[13] In evaluating the sufficiency of the proof, we must view the evidence in the light most favorable to sustaining the judgment, and we may not reverse the trial court's factual findings unless they are clearly erroneous or, equivalently, plainly wrong or without evidentiary support.[14] Whether the CPO forbade the acts proved is a question of law, as to which our review is *de novo.*[15]

9. D.C.Code § 16–1001(5) (1994 Supp.) (emphasis added).

10. *McKnight v. Scott*, 665 A.2d 973, 975 (D.C. 1995).

11. *Sandoval v. Mendez*, 521 A.2d 1168, 1171 (D.C.1987).

12. *See* D.C. Law 10–237, § 2(a), 42 D.C.Reg. 36, 1636 (effective March 21, 1995). According to a Judiciary Committee Report, witnesses had urged the Council to broaden the definition of an intrafamily offense to cover, *inter alia,* "non-intimate acquaintance situations, such as housemates," or "any relationship where there is a very close association, contact, or familiarity." COUNCIL OF THE DISTRICT OF COLUMBIA COMM. ON THE JUDICIARY, Report on Bill No. 10–477, the "Domestic Violence in Dating Relationships Act of 1994" (Oct. 12, 1994), at pp. 3, 4.

13. *See Ba v. United States*, 809 A.2d 1178, 1182 n. 6, 1183 (D.C.2002); *Mabry v. Demery*, 707 A.2d 49, 51 (D.C.1998). The requirement of willfulness imports knowledge of the court's order and an intent to do what the order proscribes. *See Jones v. Harkness*, 709 A.2d 722, 723–24 (D.C.1998).

14. *See Jones*, 709 A.2d at 723; *Vereen v. Clayborne*, 623 A.2d 1190, 1192 (D.C.1993).

15. *See Ba*, 809 A.2d at 1182–83.

Crediting what it referred to as "the testimony" of Ms. Yegzaw and Ms. Taffese, the trial court found that appellant violated the CPO by making threats to kill Ms. Yegzaw and to have her deported. That finding is clearly erroneous, for Ms. Yegzaw did not testify, and Ms. Taffese never said appellant threatened to kill Ms. Yegzaw. The only threat to which Ms. Taffese testified was appellant's threat to have Ms. Yegzaw deported.[16]

Ms. Taffese's testimony about that threat and the circumstances surrounding it, if credited, seems to us sufficient, if barely so, to make out a CPO violation by appellant. In ordering appellant not to "assault, threaten, harass, or stalk [Ms. Yegzaw], or destroy [her] property," the CPO appears aimed at preventing conduct of a criminal or incipiently criminal nature. As appellant points out, threatening someone with deportation does not violate the criminal threats statutes in this jurisdiction.[17] However, the District's anti-stalking statute criminalizes "harassing," *i.e.*, "engaging in a course of conduct either in person, by telephone, or in writing, directed at a specific person, which seriously alarms, annoys, frightens, or torments the person, or engaging in a course of conduct either in person, by telephone, or in writing, which would cause a reasonable person to be seriously alarmed, annoyed, frightened, or tormented."[18] Appellant argues that acts of a "harassing" nature must be committed "on more than one occasion" to violate the statute,[19] and that no such repetition was proved here, because Ms. Taffese testified to only one instance of harassment at most. But as a prophylactic measure imposed in the wake of an intrafamily offense, the CPO need not await the materialization of a full-fledged criminal pattern; rather, we think it must be read as proscribing even a single act of harassment, if that act otherwise satisfies the statutory definition of the offense. While it seems to us a close question whether appellant's threat of deportation, under the particular circumstances it was made, was sufficiently distressing and malicious to meet that test, we are not prepared to hold that no reasonable trier of fact could so find.

█ Nonetheless, we cannot say that the trial court would have found appellant guilty of willfully violating the CPO based on Ms. Taffese's account alone—that is, without mistakenly relying on Ms. Yeg-

---

**16.** The trial court did not cite Ms. Taffese's testimony that appellant "was going to hit" or "came forward to hit" Ms. Yegzaw, nor did the court find that appellant had committed an assault. Because Ms. Taffese did not further describe what she saw appellant do, or otherwise explain her conclusion that appellant was about to hit Ms. Yegzaw, we do not think her testimony would support a finding beyond a reasonable doubt that appellant committed either attempted-battery assault or intent-to-frighten assault. *See Robinson v. United States*, 506 A.2d 572, 574–75 (D.C. 1986) (contrasting elements of each type of assault); *see also Joiner–Die v. United States*, 899 A.2d 762, 765 (D.C.2006) (enumerating elements of intent-to-frighten assault).

**17.** Those statutes criminalize only to threats to do bodily harm, *see* D.C.Code § 22–407

(2001), or threats to kidnap any person or to injure the person of another or physically damage the property of another, *see* D.C.Code § 22–1810 (2001).

**18.** D.C.Code § 22–404(e) (2001 & Supp. 2007). A violation of the anti-stalking statute can be made out in four different ways, one of which is by proving that the accused on more than one occasion engaged in conduct with the intent to cause emotional distress to the complainant by willfully, maliciously, and repeatedly harassing the complainant. *See* D.C.Code § 22–404(b) (2001 & Supp.2007); *see also United States v. Smith*, 685 A.2d 380, 383 (D.C.1996); *Richardson v. Easterling*, 878 A.2d 1212, 1217 (D.C.2005).

**19.** D.C.Code § 22–404(b).

zaw's allegations as well. Because the court based its decision on clearly erroneous findings—that Ms. Yegzaw testified and that appellant threatened to kill her—we are constrained to remand this case for the court to weigh the evidence in the record afresh and render a new verdict.[20]

*So ordered.*

---

**20.** *See In re C.J.,* 514 A.2d 460, 463–64 (D.C. 1986) (reversing judgment in a bench trial, although there was sufficient evidence to support the verdict, because "the trial judge's findings contain factual statements that are unsupported by the record," and "the possibility exists that in finding guilt, the trier of fact was swayed by erroneous factual matter"); *see also Nat'l Hous. P'ship v. Mun. Capital Appreciation Ptnrs. I, L.P.,* 935 A.2d 300, 321 (D.C.2007) (same).